[Cite as *Shelly Co. v. N.E.S. Corp.*, 2026-Ohio-3019.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

THE SHELLY COMPANY, ET AL.,     :

    Plaintiffs-Appellees,     :

    Nos. 115409 and 115668

    v.     :

N.E.S. CORP., ET AL.,     :

    Defendants-Appellants.     :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** August 6, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-968212

---

### *Appearances:*

Hahn Loeser & Parks LLP, Aaron S. Evenchik, Gregory A.
Thompson, and Benjamin J. Horvath, *for appellees.*

Flowers & Grube, Michael J. Factor, and Paul W. Flowers;
Audra J. Zarlenga, *for appellants.*

DEENA R. CALABRESE, P.J.:

{¶ 1} In these consolidated appeals following a bench trial and post-trial proceedings, defendants-appellants Perk Company, Inc. ("Perk"), Anthony Cifani ("Tony Cifani"), and Hudson Insurance Company, Inc. d.b.a. Hudson Insurance

Group ("Hudson") (collectively the "Perk Defendants") challenge the trial court's judgment awarding damages and attorney fees to plaintiffs-appellees The Shelly Company, Shelly Materials, Inc., Allied Corporation d.b.a. StoneCo, Inc., and Jefferson Materials Company d.b.a. StoneCo, Inc. (collectively "Shelly"). We find some merit to the appeal. Accordingly, we affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

{¶ 2} This appeal concerns Shelly's efforts to collect payment for materials supplied in connection with various roadway projects. Shelly consists of related corporate entities that supply materials, including asphalt, for roadway construction and maintenance projects. In its original complaint filed September 1, 2022, Shelly named its customer N.E.S. Corp. ("N.E.S."), along with N.E.S.'s president, John Bojec ("Bojec"), as defendants. N.E.S. is an asphalt paving contractor. Shelly sought to recover in excess of $1,244,769.05 for materials supplied pursuant to contract. Shelly also sought recovery against Bojec individually pursuant to a personal guaranty he had executed, agreeing to be held jointly and severally liable for any of N.E.S.'s debt to Shelly. Shelly's original complaint consisted of four counts, specifically:

Count I: Breach of contract against N.E.S. and Bojec;

Count II: Unjust enrichment against N.E.S. and Bojec;

Count III: Action on account against N.E.S. and Bojec; and

Count IV: Breach of personal guaranty against Bojec.

**{¶ 3}** The complaint included multiple attachments, including an agreement with incorporated personal guaranty and a six-page aged analysis report — i.e., an account statement — reflecting a total balance due of $1,244,769.05. Shelly sought that sum plus contractual interest, attorney fees pursuant to the terms of the contract, and costs.

**{¶ 4}** On December 8, 2022, before any answers had been filed, the trial court held a case-management conference. By agreement of appearing counsel, Shelly was granted leave to file an amended complaint no later than December 23, 2022.

**{¶ 5}** On December 22, 2022, Shelly filed its first amended complaint, which joined Perk, Hudson, Great Midwest Insurance Company ("Midwest"), and Mahorsky Group Inc. ("Mahorsky") as defendants. Like N.E.S., Perk is Shelly's customer. Hudson, Midwest, and Mahorsky were named as sureties and were sued for recovery on payment bonds issued in relation to specified projects. In addition to its original allegations, Shelly contended, inter alia, that Tony Cifani, Perk's majority shareholder, had obtained an ownership interest in N.E.S. pursuant to a stock-purchase agreement, that N.E.S. and Perk "have common and overlapping management and ownership[,]" and that after the stock-purchase agreement "Shelly was directed to treat Perk and [N.E.S.] as the same entity." The amended complaint alleged, for example, that both N.E.S. and Perk issued checks to Shelly to pay amounts charged to N.E.S. and that Perk issued checks to Shelly for both Perk's and N.E.S.'s invoices. Shelly therefore contended that Perk and N.E.S. "managed . . .

projects in a horizontally integrated manner" and should be held jointly and severally liable to Shelly for payment.

{¶ 6} Counts I through III, for breach of contract, unjust enrichment, and action on account, were amended to join Perk in addition to N.E.S. and Bojec. Count IV, which sought recovery under a personal guaranty, named only Bojec. The amended complaint contained additional counts (Counts V-VII) against N.E.S., Perk, and the sureties seeking recovery on the payment bonds. Count VIII of the amended complaint sought a declaratory judgment as to whether N.E.S. and Perk were "alter egos of each other for the purposes of" Shelly's action against them.[1]

{¶ 7} On January 17, 2023, Shelly filed a notice of voluntary dismissal with prejudice as to Mahorsky only. On February 22, 2023, the trial court held a pretrial conference and established discovery and other deadlines. Shelly filed a notice of dismissal with prejudice of its claims against Midwest on February 24, 2023. The trial court held another pretrial conference on March 2, 2023, and scheduled a settlement conference for August 10, 2023.

{¶ 8} On May 1, 2023, pursuant to a settlement agreement, Shelly dismissed all of its claims against Bojec, with the court to retain jurisdiction to enforce the terms of the settlement agreement.

{¶ 9} The trial court granted the parties' joint motion to continue the August 10, 2023 settlement conference but held the parties' contemporaneous

---

[1] The amended complaint incorrectly captioned Count VIII as Count VII. The amended complaint clearly consisted of eight counts.

request to amend the case-management schedule in abeyance. Following a pretrial held December 13, 2023, the trial court amended the case-management order.[2]

{¶ 10} Discovery continued, including motion practice pertaining to certain bank records. On January 29, 2024, Shelly filed its motion to file a second amended complaint instanter "to add Anthony J. Cifani as an additional Defendant based on his execution of a personal guaranty in favor of Shelly." The proposed amended complaint also deleted allegations pertaining solely to defendants who had been dismissed from the case.

{¶ 11} The Perk Defendants did not oppose Shelly's motion, and the trial court granted Shelly leave to file its second amended complaint. Shelly filed its second amended complaint, along with the associated filing fee, on February 14, 2024. The second amended complaint consisted of six counts:

Count I: Breach of contract against N.E.S., Perk, and Tony Cifani;

Count II: Unjust enrichment against N.E.S., Perk, and Tony Cifani;

Count III: Action on account against N.E.S., Perk, and Tony Cifani;

Count IV: Breach of personal guaranty against Tony Cifani;

Count V: Payment bond claim against Perk and Hudson; and

Count VI: Declaratory judgment against N.E.S. and Perk pursuant to an alter ego theory of liability.

---

[2] The trial court set the case for trial by jury, even though no party had made a jury demand. (It had likewise set the case for a jury trial in its orders dated February 23, 2023, and May 4, 2023.) On May 6, 2024, the Perk Defendants filed a motion to strike the jury trial order. The trial court granted the unopposed motion on September 4, 2024.

{¶ 12} While Perk and Hudson timely answered, Tony Cifani did not, and Shelly filed a motion for default judgment on March 22, 2024. Tony Cifani later sought leave to file an answer instanter, which the trial court granted.

{¶ 13} Shelly filed a motion for partial summary judgment on May 2, 2024, seeking judgment as a matter of law on Count I (breach of contract), Count IV (breach of personal guaranty against Tony Cifani), and Count V (claim on payment bond). On July 15, 2024, the Perk Defendants filed a combined cross-motion for summary judgment and brief in opposition to Shelly's motion for partial summary judgment. While we will not summarize the parties' cross-motions in detail, we note that the Perk Defendants' motion requested summary judgment on all of Shelly's claims, including the count for declaratory judgment, and their supporting brief contains substantial discussion of corporate veil piercing. For example, the Perk Defendants argued that Shelly "cannot meet any of the prongs necessary to pierce the Defendant NES corporate structure as it relates to Perk or [Tony] Cifani[]" and that under applicable law there was "not enough to pierce the corporate veil and to hold either Perk or [Tony] Cifani personally liable for NES' s unpaid corporate debts to" Shelly.

{¶ 14} On August 13, 2024, Shelly filed its combined reply brief in support of its motion for partial summary judgment and its opposition to the Perk Defendants' motion for summary judgment. Shelly argued, inter alia, that the Perk Defendants were not entitled to summary judgment "on the issue of veil-piercing . . . because the record evidence discovered to date offers significant support for the conclusion that

Cifani and Perk abused NES's corporate form and exercised such control over NES such that it was a mere alter ego of Cifani and Perk." Elsewhere in the brief, Shelly argued:

> The deposition testimony and the documents produced so far offer significant support for Shelly's allegations that Mr. Cifani and Perk operated NES as if it had no separate mind, will, or existence of its own, exercised in such a manner as to commit fraud against Shelly.

{¶ 15} The Perk Defendants filed a further reply brief on September 4, 2024. While claiming that there was no "supporting proof" that Tony Cifani and his brother became minority shareholders in N.E.S., the Perk Defendants also argued that "there was never any allegation that Perk was ever a shareholder in" N.E.S.:

> Shelly's veil piercing claim against Defendant Perk must be dismissed as a matter of law, because Shelly has proffered no evidence to dispute the fact that ***Perk was never a shareholder of NES***. None of Perk's alleged actions listed on Page 13-15 of Shelly's Opposition are relevant. Since Perk was never a shareholder of NES, the *Belvedere* test is inapplicable.

(Emphasis in original.) In other words, while the reply brief addressed veil piercing as to Perk, it did not address veil piercing as to Tony Cifani personally.

{¶ 16} On October 1, 2024, the trial court ordered the Perk Defendants to produce discovery pursuant to its February 12, 2024 order within 14 days. It held Shelly's associated motion to show cause in abeyance. The same day, the trial court denied the parties' cross-motions for summary judgment without opinion, other than to remark that "questions of material fact remain for trial."

{¶ 17} The Perk Defendants filed their initial trial brief on October 14, 2024. They argued, inter alia, that Tony Cifani was either never a shareholder of N.E.S. or

"would have only been a 20% shareholder of N.E.S. for a brief moment in time." Accordingly, the Perk Defendants argued that Shelly's veil-piercing arguments should fail.

{¶ 18} Shelly likewise filed its initial trial brief on October 14, 2024. In addition to other arguments, Shelly wrote that the evidence would "support the conclusion that Defendants Perk and Cifani abused NES's corporate form with the intent of avoiding payment obligations to Shelly[]" and that Shelly therefore "seeks to pierce the corporate veil to Defendants Perk and Cifani" in the amount of "$997,838.19 plus interest and legal fees[.]" In a table summarizing their theories of liability, Shelly included the same argument, writing that one theory they intended to present at trial was "[v]iel-piercing [sic] against Perk and Cifani for their abuse of NES's corporate form[.]"

{¶ 19} The Perk Defendants filed a revised trial brief on January 24, 2025. They again argued, inter alia, that "Shelly is improperly trying to pierce N.E.S.'s corporate veil of limited liability to attempt to get to one alleged minority shareholder of N.E.S., Anthony Cifani, and/or to Perk." The Perk Defendants further stated that while veil piercing was raised in Shelly's original trial brief filed October 14, 2024, it "was never actually alleged in the Second Amended Complaint at issue in this case." Shelly filed a fresh version of its own trial brief the same day, reiterating that it sought to pierce the corporate veil against both Perk and Tony Cifani.

## II. The Trial

{¶ 20} The case was tried to the bench on January 31, February 3, and February 4, 2025.

### A. Shelly's Case-in-Chief

{¶ 21} Shelly called five witnesses in its case-in-chief. We summarize their testimony in order.

### 1. John Trafficante

{¶ 22} Shelly called credit manager John Trafficante as its first witness. Trafficante identified himself as a credit manager for Shelly's northeast division, a position he had held for approximately six years. Trafficante stated that he reviewed credit applications for new customers and would ultimately monitor billing and payment activity to ensure collection on all receivables. He then walked through the process of providing a credit application to customers and following up by checking credit references. Trafficante testified that a successful applicant would also be given a customer agreement and that an individual would be required to sign a personal guaranty page "in case the company itself is unable to pay the bills[.]" (Tr. 51.)

{¶ 23} Trafficante then testified concerning the process customers followed to obtain materials, indicating that Shelly would provide a quote for a particular job based upon information provided and, if the customer was satisfied, the customer would complete a purchase order. The "purchase order is sent to billing[,]" and then

once a job is set up, the customer "is then able to get materials for that job[]" via phone, email, or by going to a Shelly plant. (Tr. 52.)

{¶ 24} Trafficante testified that if a customer needed product delivered, Shelly could handle delivery or the client could arrange for hauling on its own. He stated that it was not Shelly's routine practice to issue a different purchase order even if Shelly would be handling delivery and that there would not typically be a separate line item in the purchase order for delivery. Instead, after delivery, Shelly would generate an invoice "for hauling itself[.]" (Tr. 53.)

{¶ 25} Asked whether invoices would always be directed to the customer identified on the purchase order, Trafficante responded in the negative, further explaining: "That's the typical process, but if we are requested to send it to a different location, we try to accommodate the customer as much as we can." (Tr. 54.)

{¶ 26} Trafficante testified to his familiarity with Perk, indicating that it generally performed concrete work, bridge work, and highway construction. He identified exhibit No. 1 as the Perk credit application with incorporated customer agreement and personal guaranty executed by Tony Cifani. Trafficante testified that Tony Cifani likewise signed the customer agreement, which included provisions specifying a finance charge on past due invoices and Shelly's entitlement to attorney fees and expenses incurred in collecting past due amounts on unpaid invoices.

{¶ 27} Trafficante identified Tony Cifani as "the principal of Perk" and a shareholder and officer of N.E.S. (Tr. 58.) He described the essential dispute in this case as pertaining to "unpaid invoices on the N.E.S. account, which consists of N.E.S.

invoices and Perk invoices." (Tr. 58.) He identified the four construction projects at issue as "Lake Avenue, Union Avenue, Auburn, and U.S. 322." (Tr. 58-59.) Trafficante testified that "the four jobs . . . were for Perk, but there are other invoices on the N.E.S. account that were for N.E.S." (Tr. 58.)

{¶ 28} According to Trafficante, Shelly contracted directly with Perk on the four construction projects at issue, with Perk as general contractor and Shelly as a material supplier. He then identified exhibit No. 2 as the purchase order for the Union Avenue project, an order for asphalt materials with the customer identified as Perk. Trafficante testified that there were still open invoices on the Union Avenue job. He further explained that when customers send payment, they indicate which invoices should be "cleared with that payment." (Tr. 63.)

{¶ 29} Next, Trafficante identified exhibit No. 3 as the purchase order for the U.S. 322 project, which likewise identified the customer as Perk and similarly ordered asphalt.

{¶ 30} Trafficante testified that exhibit No. 4 was the purchase order for the Auburn project and was likewise for asphalt. His identification of the customer on the purchase order as Perk, however, drew an immediate objection. The electronically printed customer name on the purchase order specified N.E.S., and the trial court itself observed: "I am looking at N.E.S." and then asked Trafficante, "Who is it billed to?" (Tr. 65.) Trafficante responded:

> It says N.E.S. initially, but then it was called in to change to Perk. It's hard to see it there, but on top of N.E.S., it's Xed out, and you can faintly see Perk on this copy. There are clearer copies that will show that.

(Tr. 66.) He testified that the same handwritten annotation reflecting a change to "Perk" was dated "6/3/21" based on additional handwritten annotations appearing at the bottom left and right of the same purchase order. Trafficante further explained:

> So this was originally produced on 4/23, but at some point between 4/23 and it looks like on 6/3, we were notified to change it from N.E.S. to Perk.

(Tr. 66.) Later, on cross-examination, Trafficante indicated that it was "switched to Perk" and pointed to a handwritten notation that he indicated stated, "'Perk, per Craig R.'" (Tr. 132.) Over defense counsel's hearsay objection, which the trial court overruled, Trafficante testified:

> [O]ur billing clerk made a note on June 3rd. . . . There's documentation up top that says "per Craig R.," that looks like June 3rd, '21. That it was changed by Craig R. and then at the bottom left our materials manager, Kerry Broth, signed off on it also on June 3rd.

(Tr. 132.) The trial court later asked Trafficante whether he was "part of this transaction[,]" to which Trafficante responded, "No." (Tr. 138.) He further conceded, when confronted on cross-examination with defense exhibit DD, that the Auburn purchase order was reissued to Perk in October 2022, but that he was unaware of any copy signed by a Perk representative. (Tr. 134-135.) Trafficante explained that if a project goes over a year, Shelly might "need to update pricing or in this case maybe we updated from N.E.S. to Perk or for whatever reason." (Tr. 136.) The trial court then pointed out that both were issued to N.E.S. Trafficante responded, "Right." (Tr. 136-137.) This exchange continued:

THE COURT: And the prior one, the later one is N.E.S. still. Can you explain that?

THE WITNESS: No.

(Tr. 137.)

{¶ 31} Trafficante testified that Shelly honored the request to change the purchase order from N.E.S. to Perk.

{¶ 32} Trafficante identified exhibit No. 5 as a purchase order for the Lake Avenue project, with Perk specified as the customer. He further testified that Shelly had not been paid in full with respect to materials supplied or services rendered under the four identified purchase orders.

{¶ 33} Testimony next turned to invoices. Trafficante identified exhibit Nos. 14-26 as invoices for the Union Avenue project. He identified exhibit Nos. 27-30 as invoices for the U.S. 322 project, exhibit Nos. 31-34 as invoices for the Auburn project, and exhibit Nos. 35-41 as invoices for the Lake Avenue project.

{¶ 34} Each invoice was directed to N.E.S. Trafficante explained that this was done because "[t]hat's what the customer requested." (Tr. 73.) The trial court asked Trafficante if he "[took] that direction from Perk" and whether it was "personally requested of" him. (Tr. 74.) Trafficante responded, "Not to me, personally." (Tr. 74.) Counsel for the Perk Defendants lodged a hearsay objection. After extensive inquiry by the trial court regarding the scope of Trafficante's personal knowledge, the trial court stated: "He has no particular knowledge as to why these were billed to N.E.S., right?" (Tr. 77.) Trafficante responded: "Well, I have spoken to other people that do some of these tasks." (Tr. 77.)

{¶ 35} Testimony then focused on exhibit No. 54, a demonstrative summary listing open invoices for each of the four construction projects. The demonstrative exhibit (essentially a spreadsheet) also included columns for the number of months each invoice was past due, accrued interest, and a column representing the invoiced amount plus interest. Trafficante testified to the amounts due before interest, consistent with the exhibit:

| | |
|---|---|
| Union Avenue | $31,638.50 |
| U.S. 322 | $41,755.48 |
| Auburn | $145,434.88 |
| Lake Avenue | $20,602.00 |
| **Total** | **$239,430.86** |

(Tr. 78-79.)[3]

{¶ 36} Trafficante then identified letters sent with respect to outstanding invoices on the various projects. Three of these exhibits — exhibit Nos. 7, 9, and 13 — corresponded to the Union Avenue, U.S. 322, and Lake Avenue projects, respectfully, and listed Hudson as surety. Exhibit No. 11 pertained to the Auburn project and listed Mahorsky as surety.

{¶ 37} Having covered what he referred to as what Perk allegedly owed Shelly, testimony turned to what N.E.S. owed Shelly. (Tr. 81.) Trafficante identified exhibit No. 52 as the credit application, customer account agreement, and personal

---

[3] As discussed below, Shelly later conceded that it was owed nothing on the Lake Avenue project, and the total claimed principal due under the projects specified above (i.e., excluding interest and any award of attorney fees and costs) was therefore reduced to $218,828.86.

guaranty pertaining to N.E.S. The N.E.S. customer account agreement contains the same provision as Perk's for interest on unpaid invoices and entitlement to legal fees and expenses associated with collection.

{¶ 38} Exhibit No. 53 was identified as an aging report for N.E.S. generated by Trafficante. He testified that it reflected "the balance owed at $1,244,769.05." (Tr. 83.) Trafficante further testified, however, that Bojec had made some payments toward the balance and that the current amount would be less because of those credits. He did not specify a sum, but did indicate that the credits would likewise lower the amount that Shelly sought from Perk. (Tr. 83.)

{¶ 39} On cross-examination, Trafficante identified the customer account numbers that Shelly assigned to Perk and N.E.S. as originally handwritten at the top of their respective credit applications. N.E.S.'s customer number was identified as 42149 and Perk's as 13607. Trafficante acknowledged that Shelly had separately provided different materials and services to both N.E.S. and Perk and that Bojec had executed the personal guaranty for N.E.S.'s account. He further indicated that nothing in the N.E.S. account paperwork indicated that Perk or Tony Cifani would be guarantors for any N.E.S.'s debts.

{¶ 40} Trafficante also admitted that Shelly sold products to N.E.S. for projects not involving Perk:

> Q. So would you agree with me that Shelly sold products to N.E.S. on projects that did not involve Perk?
>
> A. That's correct.

(Tr. 92.)

{¶ 41} Trafficante confirmed on cross-examination that Shelly's standard terms and conditions for material sales indicated that "[u]nless otherwise agreed in writing, all materials purchased by buyer shall be FOB. Seller plant sourcing the order." (Tr. 102-103.) Trafficante then agreed that if Perk signed a purchase order for asphalt to be picked up at a Shelly plant, the price quoted would be for the material to be picked up at Shelly's plant, and there was nothing in the purchase order identifying an hourly trucking rate that Perk had agreed to pay. (Tr. 103.) He further conceded that, for example, the invoices to N.E.S. for the Lake Avenue project, exhibit Nos. 35-41, directly invoiced N.E.S., and only for hauling. He could not say, however, whether it was N.E.S. or Perk who requested hauling. (Tr. 107.) He clarified that "hauling is not included in the purchase orders" because those consisted just of "quoting of the prices for the material[,]" which was done in advance of any shipping determination. (Tr. 109-111.)

{¶ 42} Asked if Shelly ever billed Perk for the hauling services that it invoiced to N.E.S., Trafficante stated that Shelly "would have billed to whoever we were asked to bill it to." (Tr. 112.) He did concede, however, that he would expect the customer that Shelly billed, to pay the invoice. (Tr. 112-113.) Trafficante even admitted the following:

> Q. So if asphalt materials were included under this purchase order, but they were not invoiced to the customer, the customer is not obligated to pay them until they receive the invoices, correct?
>
> A. Correct.

(Tr. 128.)

{¶ 43} Trafficante testified that Shelly did not invoice Perk for at least some asphalt materials under the U.S. 322 purchase order because they "were asked to bill them to N.E.S." (Tr. 129.) He admitted that he had no firsthand knowledge of who told Shelly to do so but stated that "it's standard business practice that if a customer makes a request, if we can accommodate them, we will." (Tr. 130.)

{¶ 44} Defense counsel then walked Trafficante through the unpaid invoices for the Auburn project, exhibit Nos. 31-34. (Tr. 138.) Trafficante conceded that all of the invoices were sent to N.E.S., not to Perk, that they were all dated and sent in 2021, and that all of the work related to the unpaid invoices was performed in 2021 rather than 2022. (Tr. 138-139.)

{¶ 45} Trafficante further identified, on cross-examination, account statements sent directly to N.E.S. employees and bearing only N.E.S.'s customer number. Trafficante admitted that exhibit P, a statement dated November 8, 2021, was sent to N.E.S. employee Gary Helf and indicated an outstanding account balance of $2,342,720.59. (Tr. 145-146.) He admitted that exhibit F was another Shelly account statement sent to Gary Helf at N.E.S. dated August 31, 2022, with an outstanding balance of $1,244,769.05. (Tr. 146-147.) Exhibit C, dated December 21, 2022, and likewise listing N.E.S. as the customer and bearing its account number, indicated an outstanding balance of $1,237,269.05. (Tr. 147-148.)

{¶ 46} On cross-examination, Trafficante admitted that exhibit D was an account statement dated January 3, 2025, issued to Perk and reflecting a balance due of $68,320.99 from February 26, 2020, up to the statement date. (Tr. 151-152.)

This was broken down in an email Trafficante sent to Tony Cifani identified as exhibit CC and dated September 26, 2022. Trafficante testified that he wrote:

> There's still a balance of discounts taken that were not earned and finance charges. The unearned discounts total $20,317.91 and the finance charges total $47,381.88. The discounts were taken on average 58.8 days late. I can waive the finance charges, but the unearned discounts need to be paid. Please include the $20,317.91 on the check due this Friday. Let me know if you need to set up a pay plan to take care of the unearned discounts.

(Tr. 152-153.)[4]

{¶ 47} Pressed on whether he ever sent Perk a statement of account indicating Perk owed Shelly over a million dollars, Trafficante stated he could not be sure. (Tr. 154.) He characterized the $68,320.99 as being owed "[o]n the Perk account 13607," evidently referring to Perk's customer number. (Tr. 154.) He conceded that "[f]or Perk Company," there were no unpaid invoices apart from the $68,320.99. (Tr. 156.)

{¶ 48} On redirect, Trafficante recounted conversations with Jackie Cifani. He stated she had used "a Perk e-mail address" and that in an email in February 2021, she informed him that she "was now taking on the role of N.E.S. accounts payable." (Tr. 159.) Furthermore, with respect to exhibit DD, Trafficante testified that the October 12, 2022 date on this version of the purchase order corresponded

---

[4] We have independently reviewed exhibit CC. Apart from insignificant punctuation changes, the statement read into the transcript is identical to Trafficante's email. Asked to explain the meaning of "unearned discounts," Trafficante testified that Shelly allows discounts for invoices "paid timely within a certain timeframe. And if they're not, they don't earn a discount. So what [Tony Cifani] did was he paid invoices late. Took the discount and short-paid us. Therefore, that's an unearned discount he tried to take." (Tr. 153.)

to the October 12, 2022 date on his accompanying email, with counsel suggesting (and Trafficante agreeing) that this did not reflect a change to or reissuance of the purchase order, but only the most recent print date.

{¶ 49} Trafficante also characterized the $239,430.86 as the total still due under "the four projects that Perk gave us purchase orders for that they then asked us to bill under the N.E.S. account." (Tr. 164.) He testified that "[t]he $60,000 they're talking about is the [sic] Perk's separate account." (Tr. 164.)

{¶ 50} On recross, Trafficante conceded that many of the unpaid invoices related to hauling. He further conceded that the final page of exhibit I, Shelly's standard terms and conditions for material sales contained in purchase orders, indicates:

> Modification. No amendment or modification of this order shall be valid or enforceable unless in writing and signed by parties sought to be charged, and no prior or current course of dealing between the parties, or any usage of trade or custom of the industry shall modify or supplement the terms and conditions of this order.

(Tr. 170; exhibit I.) He further admitted to not being the individual who handled the change to the N.E.S. purchase order (exhibit No. 4) and to lacking any firsthand knowledge regarding how the change was handled. (Tr. 171-172.)

{¶ 51} On further redirect, Trafficante testified that when he emailed with Jackie Cifani regarding open accounts, she used the email address JJCifani@Perkcompany.com. (Tr. 174.)

## 2. Tony Cifani

{¶ 52} Shelly next called Tony Cifani on cross-examination. Tony Cifani testified that he was the CEO, secretary, and treasurer of Perk, and also its majority shareholder. (Tr. 178.) He conceded that N.E.S. was no longer doing business. (Tr. 178-179.) He admitted that he was "going to be a 20 percent shareholder" in N.E.S. "at one time," but that there had been no transfer of money or stock. (Tr. 179.) He did concede, however, that it was his intention to help N.E.S., including increasing its bonding capacity. He cosigned on a line of credit with CF Bank, and N.E.S. eventually switched its banking to CF Bank, the same bank Perk uses. (Tr. 180-181.)

{¶ 53} Tony Cifani further admitted that Perk performed contract administration support for N.E.S., as well as payroll and accounting support. (Tr. 181.) N.E.S. ultimately switched its account system to the same one Perk uses. Perk would assist N.E.S. with "entering invoices," and the two companies would use workers to fill in for each other if they were short. (Tr. 192.) He also admitted to signing checks on behalf of N.E.S. (Tr. 182.)

{¶ 54} Counsel confronted Tony Cifani with the July 23, 2020 stock-purchase agreement between Bojec as seller and Gary Helf, Tony Cifani, Joseph Cifani, and Kevin Covell as purchasers. (Exhibit No. 45.)[5] Tony Cifani conceded he executed the stock-purchase agreement for a 20 percent share in N.E.S., and that he

---

[5] We note that the stock purchase agreement, though dated July 23, 2020, has a closing date of July 22, 2020. Furthermore, the two unanimous actions discussed below are both dated July 22, 2020.

signed as secretary of N.E.S. (Tr. 183-184.) He interjected, however, that the transfer of funds in the amount of $7,500 under the stock-purchase agreement "never happened." (Tr. 184.)

{¶ 55} Exhibit No. 64, a unanimous written action of the shareholders of N.E.S. dated July 22, 2020, purports to elect the five shareholders named above as the board of directors for N.E.S. Tony Cifani admitted that he signed it, along with others. (Tr. 184-185.) Similarly, he admitted that he signed exhibit No. 65, a unanimous action of N.E.S. shareholders appointing each of the shareholders as officers. (Tr. 185.) Tony Cifani was appointed as secretary of N.E.S. According to exhibit No. 65, Bojec was to serve as president, Helf as vice president, Joseph Cifani as treasurer, and Covell as chief financial officer.

{¶ 56} Next, Tony Cifani admitted to signing several loan documents with CF Bank, conceding that he intended to be honest with the bank. (Tr. 186.) Exhibit No. 72 identified N.E.S. as the borrower, CF Bank as the lender, and contains Tony Cifani's signature as secretary of N.E.S. The document bears a loan date of May 11, 2021, and is in the principal amount of $150,000. Tony Cifani signed the same paperwork in several additional locations indicating he served as secretary of N.E.S. and chief financial officer of Perk. The following exchange occurred:

> Q. Mr. Cifani, I understand that others signed this as well, but you are representing to a lending institution that you are an officer of N.E.S.?
>
> A. Sure.

(Tr. 192.)

{¶ 57} Tony Cifani continued to insist that the stock-purchase agreement was never consummated because he never paid Bojec for the shares and Bojec never issued them, but he conceded that he represented to CF Bank in May 2021, nearly a year after the stock-purchase agreement, that he was an officer of N.E.S. He agreed that the loan documents, in nine locations, reflect that he signed them on behalf of N.E.S. (Tr. 195.) This line of interrogation continued:

> Q. But I guess I want to understand something about your testimony. As of when you're signing Exhibit 72, which has a loan origination date of May 11, 2021, almost a year after you signed the shareholder purchase agreement, you are still uncertain, is that your testimony, of whether or not you were going to be a shareholder or officer of N.E.S.?
>
> A. I anticipated I was going to.
>
> Q. A year later you were still anticipating?
>
> A. Yes.

(Tr. 195.)

{¶ 58} Pressed on whether he ever told CF Bank that the stock purchase never went through, Tony Cifani responded that he did not because he had signed for Perk as well, so he "knew [he] was liable for it." (Tr. 195-196.)

{¶ 59} Next, Tony Cifani agreed that he signed both a customer account agreement between Perk and Shelly and a corresponding personal guaranty. (Tr. 196-197.) Counsel walked Tony Cifani through the four projects at issue in which Perk was the general contractor and confirmed Perk had been fully paid on each project. Tony Cifani specifically denied that Perk ordered materials on the Auburn project. (Tr. 202 and 204.) He conceded that to his knowledge, all of the

materials were delivered in good order, those materials were incorporated into the project, and Perk had been paid as general contractor on the project. (Tr. 202.)

{¶ 60} On April 20, 2021, a representative of CF Bank sent an email to individuals at Perk and N.E.S., including Tony Cifani, indicating there were insufficient funds in the N.E.S. account to honor outstanding checks. (Exhibit No. 70.) Tony Cifani conceded, based on exhibit No. 86, that he thereafter personally signed some Perk checks to transfer money from Perk's account to the N.E.S. account in the amounts of $50,000 and $100,000. (Tr. 210-211.) He also signed a check from Perk to N.E.S. in the even amount of $100,000 on May 27, 2021. (Tr. 214.) Another check from Perk to N.E.S. was in the even amount of $5,000. (Tr. 215.)

{¶ 61} Exhibit No. 79 contained, inter alia, a CF Bank statement with an ending date of March 31, 2023. (Tr. 216-217.) The statement included a check from N.E.S. to Perk, dated March 15, 2023, signed by Tony Cifani, in the amount of $250,243.35. (Tr. 217.) A week later, there is a check from N.E.S. to Perk, likewise signed by Tony Cifani, in the amount of $49,000.

{¶ 62} Questioned by the court, Cifani claimed that the checks would have "two parts," including a part not duplicated in the CF Bank account statement "that shows what these are for." (Tr. 219.) Counsel for Shelly represented to the court that no such items were produced in discovery. (Tr. 220.)

{¶ 63} The Perk Defendants deferred Tony Cifani's direct examination to their case-in-chief.

### 3. John Bojec

{¶ 64} Bojec testified to his line of work — construction highway paving — and provided a brief history of N.E.S. He was president of N.E.S. "[u]p until June of 2020 when [he] sold 80 percent off to shareholders[,]" namely, "the Cifanis, Kevin Covell and Gary Helf." (Tr. 223-224.) He first became involved with Tony Cifani in early 2020 through an introduction arranged by Helf. They had several meetings to discuss "joining forces to do paving work for Perk and possibly putting an asphalt plant in Cleveland." (Tr. 225.)

{¶ 65} Bojec explained that Perk was letting out extensive subcontractor work "to other paving contractors, and it would have been a boost for N.E.S. to have additional work on a subcontract level versus prime bidding." (Tr. 225.) Bojec testified that the planned arrangement of Perk as general contractor and N.E.S. as a subcontractor came to fruition, but the businesses became "a little bit more integrated as time went on." (Tr. 226.) Specifically, Perk stepped in to "participate" when N.E.S. did not have sufficient employees or equipment for certain projects. (Tr. 227.) He rejected Shelly's counsel's suggestion that there were "discussions about Perk getting more involved to help N.E.S. out[,]" testifying instead that "it was an organic road that there was a need to fill and it was filled." (Tr. 227.) Things only became more formal through the stock-sales agreement and other arrangements such as "going back-and-forth as far as bank loans, certain contracts, equipment purchases." (Tr. 227.)

{¶ 66} Turning to exhibit No. 45, Bojec identified the stock-purchase agreement dated July 23, 2020. Bojec testified that prior to the agreement, he was the sole owner of N.E.S. (Tr. 228.) While the agreement called for each of the new shareholders to pay Bojec $7,500, he did not ask for the payment. Instead, Bojec "made the suggestion [that he] would rather see the money left in the company." (Tr. 229.)

{¶ 67} Asked to describe subsequent integration of the two companies, Bojec first testified that N.E.S. moved from its location on Independence Road to Perk's shop and equipment yard location on Crayton Avenue, but "[m]ore so [as] a cost savings measure. Rather than paying two leases, it made more sense to commingle and move under one location." (Tr. 230.) The shops were across the street from one another. "Same property. Just separate buildings." (Tr. 232.)

{¶ 68} N.E.S. also moved its business office from the Independence Road location to the Perk business offices on Grand Avenue as "just another cost savings measure." (Tr. 230-231.) The arrangement "was mutual[,]" and "actually probably [Bojec's] suggestion to do that[,]" to which "Tony agreed." (Tr. 231.)

{¶ 69} Bojec next testified regarding "participation with employees." (Tr. 232.) He identified Kevin Covell as an estimator for Perk and, as identified in exhibit No. 45, a 20 percent shareholder in N.E.S. Covell started devoting time to day-to-day N.E.S. operations. He "was a key person involved with N.E.S. He helped with bidding, bill paying, typical accounting, things that would go on." (Tr. 232.)

This was a "manager-type" role that involved, for example, making decisions on estimating and approving payments. (Tr. 233.)

{¶ 70} Tony Cifani became involved with N.E.S. bidding, but Bojec testified that his involvement "depended probably more so on if it was a direct N.E.S. prime bid or a sub to Perk." (Tr. 233.) Typically, however, "the estimators, Gary [Helf] and Craig [Ronyak], would supply a cost number to [Tony Cifani,] and [Bojec] believe[d] he was the one putting the profit in." (Tr. 233.)

{¶ 71} Next, Bojec testified concerning shared resources between N.E.S. and Perk. With respect to the office, Perk supplied the space, but N.E.S. brought its own office furniture. "The biggest integration would have been that the — all of the N.E.S. documentation, electronic digitals were all put on [Perk's] server called the N-drive." (Tr. 234.) These "digitals" were essentially "[a]ll file products. . . . Everything from A to Z." (Tr. 235.)

{¶ 72} With respect to field equipment, according to Bojec, Perk had some involvement. He explained that "N.E.S. had a minimal amount of equipment that it owned that it brought in[,]" and when some larger pieces of equipment needed to be purchased by N.E.S., Perk signed on as a guarantor for lenders. (Tr. 235-236.) It was at Tony Cifani's direction that N.E.S. switched its banking from First Federal of Lakewood to CF Bank. Bojec could not recall any other involvement Tony Cifani had with switching financial services regarding N.E.S. (Tr. 236.)

{¶ 73} Bojec next testified that Tony's daughter, Jackie Cifani, "was really the only secretary that focused on N.E.S.'s day-to-day operations." (Tr. 237.) She

handled "initial accounting work, making sure bills were entered, payments were going out," and tracked whether "job contracts were completed." (Tr. 237.)

{¶ 74} N.E.S. switched its accounting software after the stock-purchase agreement. Bojec explained that N.E.S. had been using "a QuickBooks program" for "simple accounting," but that it "was not up to standard or the amount of work we were doing." (Tr. 237-238.) N.E.S. switched to an accounting program called Foundations. (Tr. 238.) He did not know what accounting software Perk used. (Tr. 238.)

{¶ 75} Bojec testified that another Perk employee, Pat Fowler, handled prebid issues for N.E.S., including bond requests, and also "was the custodian of the checkbook." (Tr. 238.) In other words, she wrote checks for N.E.S. to handle payables. (Tr. 238-239.) In addition, in roughly "midsummer" of 2021, others from Perk, including Joe Cifani, became involved in N.E.S. hiring and firing. (Tr. 239.) Bojec testified that he was "overruled on the firing" of two individuals (including N.E.S. employee Craig Ronyak) by Tony and Joe Cifani. (Tr. 239-240.) Bojec also handled approximately 90 percent of N.E.S.'s scheduling, but that diminished over time, according to Bojec's testimony, with Craig Ronyak and Jerry Fausky — both of whom were N.E.S. employees — assuming some responsibility, as well as Perk superintendent Chuck Bramley. (Tr. 240-241.)

{¶ 76} With respect to responsibilities for ordering materials for N.E.S., Bojec testified that he was responsible prior to execution of the stock-purchase agreement and remained responsible throughout 2021. (Tr. 241.) He rejected the

notion that this responsibility was "taken away," but stated that "it was taken over by someone else, yes." (Tr. 242.) He identified that someone as "[p]redominantly Craig Ronyak[,]" an N.E.S. employee who had "daily communications" with Perk superintendent Chuck Bramley. (Tr. 242.)

{¶ 77} Bojec next testified concerning the circumstances surrounding his resignation. In September 2021, Tony Cifani called a shareholder meeting "and said that he was contacted by Dave Ronyak for the purchase of N.E.S. Corp.," with the proposal that Dave Ronyak would take over operations and buy N.E.S.'s equipment. (Tr. 243.) Bojec was not in favor of the sale:

> I felt that that wasn't necessary at that time. Even if N.E.S. was not profitable, it was still operating. That was the COVID area time, so things weren't good probably for anybody at that time, and it was just the nature of the situation. I felt that it could have pulled out of it, changed the, you know, operating practice and little bit. Maybe tried pull in the reins a little bit for some cost-saving measures.

(Tr. 244.)

{¶ 78} By the end of 2021, however, Bojec was receiving calls from vendors and subcontractors of N.E.S. "looking to get paid." (Tr. 244.) Bojec testified he "didn't have the ability to make the decisions if they got paid or not[,]" and that he instead put in requests to Tony Cifani but received no response. (Tr. 244-245.)

{¶ 79} Bojec could not say whether a sale of N.E.S. to Dave Ronyak was consummated, but he did testify that Ronyak came into possession of certain N.E.S. equipment. Bojec testified that he did not approve the transfers, but he could not say who did. (Tr. 246.)

{¶ 80} Bojec testified that prior to his resignation, Jackie Cifani sent him lien waivers, i.e., that she asked him "[t]o sign payment waivers showing that Perk paid N.E.S. for its work." (Tr. 247.) He testified he did not do so because "there was no verification that N.E.S. was actually paid." (Tr. 247.) Bojec testified he was never shown verification that Perk had paid N.E.S. (Tr. 248.)

{¶ 81} Also in 2021, Bojec had conversations with Tony Cifani regarding N.E.S. payables. Specifically, he and Tony Cifani "had several conversations trying to come up with game plans and what the thoughts were going to be to try to get everybody paid after the jobs were closed out." (Tr. 252.) He was not aware whether any such plans were followed through. (Tr. 252.)

{¶ 82} Bojec testified that his resignation from N.E.S. in early 2022 was prompted by Perk's information technology servicer, TeamLogic, remotely wiping his laptop.[6] His personal records (such as tax documents) were restored after about three days, but no N.E.S. information was restored. (Tr. 254.)

{¶ 83} On cross-examination, Bojec explained that at the time of his resignation, he did not contact other shareholders to purchase his 20 percent interest in the company because "[i]t was pretty much known that the company was closed in '21 and that no other operations would be continuing beyond that point." (Tr. 257.) He admitted that he started another company, Geauga Highway Company, in December 2021, which does work similar to that performed by N.E.S.

---

[6] Bojec testified that his computer was "hacked," but his testimony suggested that it was essentially a work laptop with virtual private network software installed, allowing remote access. (Tr. 253.)

(Tr. 266-268.) Bojec further conceded that a law firm sent a collection letter on behalf of N.E.S. to Dave Ronyak, dated January 27, 2025, and that the subject was collection for the same equipment he had sent an email about on December 19, 2022, where he indicated he "still maintain[ed] the president position" of N.E.S. (Tr. 268-269; exhibits OO and NN.) He claimed that his resignation from N.E.S. was "never accepted" by all of the remaining shareholders. (Tr. 270.)

{¶ 84} Bojec also conceded that following the execution of the shareholder agreement, N.E.S. benefited from an increased line of credit and bond capacity, allowing the company to scale up its paving work. (Tr. 288-290.) He admitted that he voluntarily signed bank documents and surety documents for N.E.S., along with the other shareholders. (Tr. 291-292.)

{¶ 85} Counsel for the Perk Defendants also cross-examined Bojec concerning the stock-purchase agreement identified by Shelly as exhibit No. 45. Bojec conceded that while the agreement was signed by individuals with an interest in Perk, they signed "[a]s individuals" and that Perk Company — i.e., the corporation — was not a party to the stock-purchase agreement. (Tr. 300-301.) Asked if Perk was "ever going to be a shareholder of N.E.S.[,]" Bojec responded that he did not "see Perk's name anywhere in the document[]" other than a reference to its corporate office as the location for closing the transactions. (Tr. 300 and 304.) With respect to any payment contemplated by the agreement, Bojec testified that he had "seen the checks[]" but did not cash them because he had "recommended that the money be kept in their possession and put into the company." (Tr. 302.)

{¶ 86} Pressed on the transfer of stock certificates, Bojec repeatedly noted that he did not create the stock-purchase agreement or handle the associated paperwork and that significant time had passed since he last had access to any N.E.S. records. When asked if he was required to sign stock certificates because he was selling them, Bojec responded: "I am an . . . asphalt contractor. I'm not a legal analyst. I don't know how stock sales work." (Tr. 310-311.) With respect to a late 2021 division of equipment and assets such as trucks, signs, and inventory when he began his new business, Geauga Highway, Bojec testified the division, which he characterized as an "equal agreement," was essentially a handshake deal principally with Joe Cifani and possibly documented by emails. (Tr. 323-326.) He did note that he "had the consent of Gary [Helf] for sure." (Tr. 327.)

{¶ 87} Bojec stated that neither he personally nor his new company, Geauga Highway, provided any services to Shelly to satisfy or pay off any portion of N.E.S.'s debts. (Tr. 328-329.) He testified that he personally paid $250,000 towards N.E.S.'s debt to Shelly. (Tr. 329-331.) With respect to an email from Tony Cifani indicating that they needed to get together to coordinate a plan for handling N.E.S.'s debts, Bojec testified that no such meeting ever occurred. (Tr. 335.)

{¶ 88} On redirect, Bojec confirmed that even for N.E.S. projects for which Perk was not the general contractor or otherwise involved, Perk still provided some services to N.E.S. such as accounting and bonding, providing "the facility [N.E.S.] operated out of," and shop services. (Tr. 338-339.) He further testified that near the end of 2021, he had conversations with Tony Cifani regarding N.E.S.'s debts:

"[W]e were trying to figure out how to get everybody paid and who wasn't going to get paid. . . . [T]he plan was to try to get all of the dollars owed to N.E.S., and try to get them disbursed out to all the vendors and creditors."  (Tr. 341.)  When asked about discussions regarding prioritizing obligations between N.E.S. and Perk, Bojec testified that "there was a great concern to get Shelly paid" and he "believe[d] Tony [Cifani] agreed that was a top priority as well."  (Tr. 341.)  Asked for clarification on whether this priority applied regardless of whether the debt belonged to N.E.S. or Perk, however, Bojec testified that he believed Tony Cifani "was focusing more on the Perk obligations because of the bond claims."  (Tr. 342.)  He clarified:

> I think especially if it was more Perk related because at that point N.E.S. was going out of business it appeared, so they could be more of, I guess as you determined, a sacrificial lamb.

(Tr. 342.)

### 4. Chadrick Reel

{¶ 89} Shelly's final witness in its case-in-chief was Shelly Vice President and General Manager Chadrick Reel.  Reel testified that he had not met Tony Cifani in person until the middle of 2020.  At that time, they met at Perk's office.  (Tr. 354.)  The meeting included Tony Cifani and "[s]everal of his employees, including John Bojec.  They were all commingled within the office."  (Tr. 354.)  Reel then stated that "Tony was the gatekeeper on conversation[,]" which prompted the trial court to warn him to refrain from characterizing interactions.  (Tr. 355.)

{¶ 90} According to Reel, Tony Cifani and John Bojec "talked about putting up an asphalt plant[,]" but Reel (or possibly another Shelly representative in

attendance) "said in lieu of . . . putting up the asphalt plant, let Shelly supply you the material." (Tr. 355.) They had multiple further meetings to discuss the relationship, including discussing "pricing in order to keep them competitive." (Tr. 356.) He described Perk as wanting "to get into the paving side of the business as they're a concrete paver, so it was really how they could become successful on the paving side of the business and add that to the portfolio." (Tr. 356.) Multiple additional meetings concerned "generally" how Perk could "continue to buy asphalt[]" and "be competitive in the market and execute on it." (Tr. 357.)

{¶ 91} Several additional meetings followed, but were devoted to discussions of continuing asphalt purchases and remaining competitive. (Tr. 357.)

{¶ 92} Much later, at another meeting, "[t]he Ronyak sale came up." (Tr. 358.) According to Reel, Tony Cifani "said they were selling the N.E.S. business to Ronyak." (Tr. 358.) Reel testified that he was concerned:

> [A]t that point, that's when the concern became very high. They're in trouble. How are we going to get paid? So we start asking questions. How are we going to get paid and we tried to work ourselves through that.

(Tr. 358.) Reel testified that Bojec was present at the meeting, but "the majority of the conversation [was] Tony[,]" who made assurances that Shelly would get paid for materials supplied. (Tr. 358-359.) Reel further testified that Tony Cifani did not distinguish between materials supplied to Perk versus materials supplied to N.E.S., i.e., he did not say that they would pay only for materials supplied to Perk. (Tr. 359.)

{¶ 93} Shelly's counsel then asked Reel whether certain "representations were made to" him regarding payment and whether he relied upon those representations:

Q. Was there a point in time when you were nearing the end of a lien period and representations were you [sic] made to you?

A. Yeah. So this is December of 2021. I'm driving. Tony calls me. This is right as they sold N.E.S. to Ronyak. And we started talking about pay and he said specifically, "Chad, do not lien any of our jobs," and that "I would be able to pay you next year."

Q. Did you rely on that representation?

A. I did rely on that representation.

(Tr. 359.)

{¶ 94} According to Reel's testimony, Tony Cifani asked him not to place liens with respect to certain jobs, promising that payment would be forthcoming in 2022. (Reel did not specifically identify the jobs.) According to Reel, Shelly "missed [its] lien rights" and "never got paid." (Tr. 360.)

{¶ 95} On cross-examination, Reel conceded that he did not have email exchanges confirming or discussing the alleged payment promises made by Tony Cifani, nor did he demand any additional personal guaranty or insist upon a promissory note, mortgage, or other formal security to ensure payment. (Tr. 364.)

{¶ 96} Reel also conceded that N.E.S. was a legally distinct entity from Perk, had completed its own credit application for Shelly, and had a unique customer identification number in Shelly's system. (Tr. 365-366.) He further admitted that

all of the invoices at issue during trial had been issued to N.E.S. rather than Perk or Tony Cifani. (Tr. 366-367.)

{¶ 97} With respect to Shelly's standard terms and conditions for material sales attached to every purchase order, Reel conceded that it states it cannot be changed absent a separate writing signed by both Shelly and the buyer. (Tr. 368.) He stated: "I understand that to mean that in order to make a change, you need a signature from both parties." (Tr. 369.) Reel stated that based upon the relationship between the parties, they sometimes "work a lot on handshakes," but agreed that if it came down to court proceedings, Shelly would need something in writing:

Q. But at the end of the day, if you have to come to Court —

A. Yes.

Q. — you need the writing, correct?

A. I would agree.

(Tr. 369.)

{¶ 98} With this foundation laid, cross-examination turned to exhibit No. 4, the Auburn purchase order. Reel conceded that the purchase order specified N.E.S. as the buyer, with N.E.S.'s customer number, and that this was how the document would have appeared on the day it was executed. (Tr. 370.) He agreed it was modified afterwards. (Tr. 370.) The following exchange occurred:

Q. And the other markings on here, we don't know who made them. True?

A. I can make an assumption, but true.

Q. It wasn't you?

A. This wasn't me. This is a normal business practice.

Q. You have no first-hand knowledge about what actually went down to make those markings on the page. True?

A. True.

Q. And there's nobody on any of those markings, no signature from anybody at all at Perk. True?

A. True.

Q. And there's nobody on any of those signatures or those markings on the page that in any way are Tony Cifani. True?

A. True.

(Tr. 371.)

{¶ 99} Next, Reel conceded that Shelly did not provide any notices of furnishing with respect to any of the invoices identified in Shelly's set of exhibits. (Tr. 371.) When questioned regarding exhibit D, he indicated that this account statement listed everything owed by Perk to Shelly for materials "billed directly to Perk" and that it reflected a balance of approximately $68,000. (Tr. 347 and 380.) Further clarifying exhibit D, he responded to questioning as follows:

Q. So none of the things that you're suing for in this case are listed in this monthly statement that we get every month at Perk. True?

A. In the statement, yes.

(Tr. 374.) Questioned regarding exhibit No. 53, the Shelly aging report reflecting a balance due of just over 1.2 million dollars, Reel agreed that it appeared to reflect the balance N.E.S. owed to Shelly in dispute in these proceedings and conceded the aging report was issued to Craig Ronyak at N.E.S. (Tr. 375.)

**{¶ 100}** On redirect, Reel stated that N.E.S. had initially been approved for a $75,000 line of credit, but that had been able "to increase their sales volume" after they received "better financial backing" from Perk. (Tr. 376-377.) He testified that "[t]o [him], there was no differentiation between Perk and N.E.S. It was one business." (Tr. 378.) He explained: "Tony made the decisions. Any major decision, it was Tony's decision to make and he made those decisions." (Tr. 378.)

**{¶ 101}** On recross, Reel confirmed that Perk had never guaranteed to pay for N.E.S.'s debt and that Tony Cifani had never executed a written guaranty for N.E.S.'s debt. (Tr. 379.) Further, despite the fact that N.E.S. and Perk operated from the same location, he testified he was unaware of whether there was a lease in place and could not confirm that there was still an arm's-length relationship between N.E.S. and Perk. (Tr. 379-380.)

**{¶ 102}** Shelly rested subject to the admission of exhibits. After a recess, and prior to offering exhibits, the following exchange occurred between Shelly's counsel and the trial court:

> [SHELLY'S COUNSEL]: I would like to start as a part of Shelly's contract claims there's a legal fee component as well. I assumed — and I should have brought this up. I assumed you would want testimony on that if you make that finding as to the amount of fees.
>
> THE COURT: We can do a separate hearing on that.

(Tr. 384-385.)

**{¶ 103}** The trial court held a detailed discussion on the record with respect to the admission of both Shelly's exhibits and exhibits used by the Perk Defendants during cross-examination. Most of the parties' voluminous exhibits were admitted

by agreement, with the court taking further argument on some and taking the matter of admission under advisement.

### B. Motion for Directed Verdict and Shelly's Oral Civ.R. 15(B) Motion

{¶ 104} Following the admission of exhibits, the Perk Defendants moved for a directed verdict both orally and in writing.  Pertinent to this appeal, one of its arguments centered around the purported absence of a pleading stating a basis for piercing the corporate veil.  At trial, the Perk Defendants' counsel argued:

> The first issue is there is no pleading anywhere in this case where it was ever alleged fraud, or illegal acts, or anything veil piercing worthy.  There is no underlying tort.

(Tr. 402.)  Counsel's arguments — and Shelly's counterarguments — were much more fulsome than this excerpt may suggest, but those arguments are consistent with the presentation of the case on appeal and need not be repeated in this summary.  At one point, however, Shelly's counsel appears to have moved to amend the pleadings to conform to the evidence:

> Under Rule 15(B), you can move to conform to the evidence.  I think these issues have been impliedly tried by the parties.

(Tr. 412.)  The trial court did not rule on the motion in the course of the bench trial.

{¶ 105} Shelly's counsel, relying on the testimony of Tony Cifani, further argued that even if the trial court found that "a contract doesn't exist for the Perk purchase order" or "where there's not a Perk direct purchase order," the unjust-enrichment claim is valid.  (Tr. 421.)

{¶ 106} The trial court did not rule on the motion for directed verdict (which could alternately be construed as a motion for involuntary dismissal under

Civ.R. 41(B)) during the bench trial itself.[7]  Instead, the proceedings continued with the Perk Defendants' case-in-chief.

### C. Perk Defendants' Case-in-Chief

{¶ 107} The Perk Defendants called four witnesses in their case-in-chief.  We summarize their testimony in order.

### 1. Craig Ronyak

{¶ 108} Craig Ronyak testified that he currently worked at Cunningham Pavement, had spent some 40 years in the business of asphalt paving, and had been an estimator for the last 20 years.  He was employed by N.E.S. in 2021, where he "was hired as an estimator, and then . . . . would help out Gary [Helf] and John [Bojec] if they needed" assistance with purchase orders or to otherwise prepare for jobs.  (Tr. 428.)  His employment with N.E.S. was limited to a few months in 2021.  (Tr. 441-442.)  He considered Helf and Bojec his bosses at N.E.S., with Bojec holding the title of president and Helf the title of vice president.  (Tr. 428-429 and 442.)

{¶ 109} Ronyak described his typical duties as an estimator.  He further testified that he had never been a Perk employee and that Tony Cifani did not review all of the bids for N.E.S.  (Tr. 429-430.)  Rather, Ronyak would review bids with Helf or Bojec unless it involved "a really small job" in the $30,000-$40,000 range.  (Tr. 430.)

---

[7] *See Meridien Marketing Group v. J&E Bldg. Group, Inc.*, 2011-Ohio-4872, ¶ 6 (2d Dist.).  "Civ.R. 41(B)(2) provides that 'when a motion to dismiss is made, the trial court can choose either to dismiss the action or to proceed with further evidence,' so a court that chooses the [latter] path does not err."  *Id.*, quoting *Pacher v. Invisible Fence of Dayton*, 2003-Ohio-5333, ¶ 34 (2d Dist.).

{¶ 110} Ronyak identified exhibit J as the subcontractor agreement between Perk and N.E.S. to perform the paving work on the Auburn project. The agreement was dated June 3, 2021, and bears Ronyak's signature on behalf of N.E.S. (Tr. 432-433.) The final page, which likewise bears Ronyak's signature, is "a quote from Shelly Materials for the asphalt costs for the Auburn, 2021 job." (Tr. 435.) He testified that the purchase order included nothing apart from the costs of the materials and that the customer was N.E.S. (Tr. 436.) Asked how the materials would get to the job site, Ronyak testified, "It was trucked." (Tr. 436.) He testified that N.E.S. was responsible for hiring and paying for hauling, whether the hauling was done by Shelly or by a separate trucking company. (Tr. 436-437.)

{¶ 111} Ronyak testified that on the Auburn project, N.E.S. was responsible for the asphalt and trucking costs. He stated that exhibit No. 31, a Shelly invoice, reflected unpaid costs on the Auburn job. (Tr. 440.)

{¶ 112} Ronyak had a low opinion of Bojec's ability to manage asphalt work. He testified that he "tried to help him, but it wasn't received well." (Tr. 443-444.) Bojec purportedly told him that he could try doing it for a couple of days. Ronyak did, but then Bojec took back the work. (Tr. 443.) He testified that N.E.S. had underbid projects to its detriment, including an Avon Lake project: "[W]e lost a lot of money on that." (Tr. 444-445.) He raised concerns to Tony and Joe Cifani, who purportedly told him that Helf and Bojec were the people running N.E.S. and that "[t]hat was my people I'm supposed to listen to." (Tr. 446.)

{¶ 113} On cross-examination, Shelly succeeded in eliciting an admission from Ronyak that Shelly's standard material delivery conditions were "[u]nless otherwise agreed in writing, all materials purchased by buyer shall be FOB seller[']s plant sourcing the order[,]" which meant that if the purchaser picked up the materials, they would not have to pay for shipping, but that if Shelly or another trucking company transported the materials to the project, trucking costs would be extra. (Tr. 448-449.) He further testified that he was not aware who personally placed orders with Shelly for materials, was not involved with N.E.S.'s accounting, and had only very limited involvement in accounts receivable. Questioned regarding his interaction with the Cifanis regarding his concerns about Bojec and Helf, Ronyak testified that the conversation occurred at approximately the end of August 2021. (Tr. 459.) He clarified his rationale for broaching the subject:

> Gary and John were not open to how to run things, how to set trucks up different, how to run jobs different, and I just went to Tony and Joe, and told them that I didn't think that what they were doing was good for the company as far as making the jobs profitable, and they said, "They're running it."

(Tr. 459-460.) He testified that he knew the Cifanis had become part-owners of N.E.S., but "didn't know percentages." (Tr. 460.)

### 2. Jacklyn Cifani

{¶ 114} Jackie Cifani testified that she is the daughter of Tony Cifani, graduated from the Ohio State University in 2019, and began performing work for N.E.S. in August or September of 2020. She was, however, a Perk employee. (Tr. 469.) She worked approximately 40 hours per week performing administrative

tasks, including payables and payroll. She reported to John Bojec and Gary Helf and was provided with a computer by N.E.S.

{¶ 115} Jackie Cifani further testified that Bojec had often asked her to sign his name on certain documents, which made her uncomfortable. She would sign things that she did not consider "super important." (Tr. 466.) She further testified that Bojec would also ask Helf to sign his name on documents. (Tr. 466.)

{¶ 116} With respect to bids, she testified that she was involved in preparing bid documents, but that Tony Cifani was not involved with any bid documents that she worked on. (Tr. 467.) She further testified that if she had issues with administrative tasks or documents she was preparing, she would turn to Bojec or Helf for assistance. She identified exhibit JJ as an email she sent to both Bojec and Helf that began with the sentence, "Please do not disregard this e-mail like you commonly have in the past." (Tr. 468.) Jackie Cifani explained that it had been "difficult to . . . get things done because [Bojec and Helf] weren't very responsive when it came to . . . the important side of things as far as the administrative work that kind of comes in the background of owning a business." (Tr. 468.) She testified that she raised concerns with Bojec and Helf but that they did not take her concerns very seriously and were generally uncommunicative. (Tr. 469.)

{¶ 117} On cross-examination, Jackie Cifani identified exhibit No. 89 as a February 2021 email chain between her and John Trafficante in which she is identified as a Perk employee. In the email, John Trafficante sent her an aging statement indicating N.E.S.'s past-due balance. Questioned as to why she did not

protest being sent an N.E.S. account statement when she was employed by Perk, she stated that she was not a "paid employee" of N.E.S. but "did do work to help them out." (Tr. 473.) At one point in the email chain, Jackie Cifani stated that she was doing her best to review the invoices but would then "leave them for [her] boss to review." She denied that her "boss," in this sentence, was meant to indicate Tony Cifani, and stated that it instead meant Bojec or Helf. (Tr. 474-475.) With respect to another email chain, however, this one dated March 18, 2022, and identified as exhibit No. 90, she conceded that she initiated the chain with John Trafficante, using her Perk email address, and requesting a copy of N.E.S.'s most recent statement. Trafficante sent the statement and asked for "an update on when another payment will be sent and for how much." Jackie responded, in pertinent part: "I believe Anthony Cifani has a meeting set up today with someone at Allied to discuss the account in order to get a payment set out."

{¶ 118} Jackie likewise identified exhibit No. 91 as a July 29, 2022 email from her Perk email account to Trafficante with the subject line, "NES & Perk Checks," and attaching an N.E.S. check made payable to Allied in the amount of $92,708.81. She testified that she "assume[d]" Bojec signed the check. She denied that anyone instructed her to sign it and further denied signing it on his behalf. (Tr. 479-480.) She testified: "I have never signed his name on any of the checks that went out." (Tr. 480.)

{¶ 119} On redirect, Jackie confirmed that exhibit No. 91 referenced two checks and contained two PDF attachments (one referencing N.E.S. and another

referencing Perk), but that the exhibit provided to the court contained a photocopy of only an N.E.S. check, with no copy of the Perk check. She further testified that while she was working for N.E.S., Bojec and Helf controlled her tasks and that Tony Cifani was never involved in directing her responsibilities. (Tr. 482-483.) Jackie testified that to her knowledge, neither Tony nor Joe Cifani ever directed who would or would not be paid by N.E.S. (Tr. 483-484.)

### 3. David Ronyak

{¶ 120} The Perk Defendants' next witness, David Ronyak, identified himself as operating Ronyak Paving Incorporated and stated that his family was now in the "third generation in the paving business." (Tr. 491.) He denied that anyone approached him about buying N.E.S., but did testify that his company came into possession of some N.E.S. equipment that they later returned at Bojec's request when Bojec indicated that N.E.S. and himself (Bojec) were on the lease paperwork. (Tr. 493-494.)

{¶ 121} Ronyak testified that he had recently received a demand letter from "a group of attorneys saying they represent N.E.S. and they were winding up its affairs." (Tr. 494-495.) He identified exhibit NN as the cover letter and exhibit LL as backup documentation. The cover letter, dated January 27, 2025, demanded $261,950. (Tr. 494-497.) He denied ever using the equipment, but stated that Ronyak Paving completed projects that N.E.S. was unable to complete. (Tr. 497.)

{¶ 122} On cross-examination, Ronyak stated that Tony Cifani had contacted him in approximately September 2021 regarding completing some N.E.S. projects.

He spoke with Tony and Joe Cifani, but Bojec and Helf were not involved in those conversations. (Tr. 499.) He conceded that he hoped his company would receive more work from Perk and that he considered Shelly his company's competitor.

### 4. Tony Cifani

{¶ 123} Tony Cifani testified that he was a shareholder of Perk Company, a concrete contractor. Perk had been in existence since 1992. He denied being a shareholder of N.E.S., claiming that "[t]he transaction never went through." (Tr. 506.) He clarified that while he had signed the shareholder agreement, he never paid for the stock and was never issued stock. (Tr. 506.) He claimed that despite Bojec's testimony, the anticipated money was not invested in the business, and he never received stock shares. (Tr. 506.)

{¶ 124} Tony Cifani also testified that Perk and N.E.S. maintained separate bank accounts. He was authorized to sign on the N.E.S. account, he testified because "[a]t the time" he "was going to be a 20 percent shareholder." (Tr. 507.) He did, however, cosign loans for N.E.S. "as an owner of Perk Company to help them out." (Tr. 507.)

{¶ 125} Tony Cifani testified that in its 32 years in business, Perk, unlike N.E.S., had not performed any asphalt work, owned no asphalt paving equipment, and did not have employees familiar with asphalt work. (Tr. 507-508.) In performing projects, however, including public works projects, Perk would subcontract work that it could not directly provide, including asphalt work. (Tr. 508.) He identified exhibit G as the subcontract for the Union project. Tony

Cifani further explained that under the subcontractor agreement, Perk would have the right to pay suppliers and others on their behalf and deduct it against any subsequent pay applications made by the subcontractor. (Tr. 510.) One reason to do so is to protect any bond in place. In short, Perk "would make sure that suppliers [and] other subcontractors would get paid on [Perk] projects." (Tr. 510-511.) Asked to explain what he meant by protecting a bond, Tony Cifani explained:

> Perk Company does 99 percent of their work as Public Works for government agencies; cities, counties, state. When we bid a job and are issued a contract, we have to put up a payment of performance bond to ensure that we perform to our standards of the contract, and that we pay our subcontractors, suppliers, et cetera, the money they're due.

(Tr. 511.) Tony Cifani further explained that if a bonding company were required to step in to pay subcontractors because Perk defaulted on a bond, it would heavily compromise Perk's ability to obtain bonds in the future, essentially eliminating its ability to perform public works projects. (Tr. 511-512 and 515.) He testified that Perk has never defaulted on a bond. (Tr. 512.) If a financially unstable subcontractor paid by Perk failed to pay a supplier, however, and if a notice of furnishing had been supplied, Perk would be required to pay the supplier, essentially paying twice for the same project, once to the subcontractor and once to the supplier who had not been paid. (Tr. 512-513.)

{¶ 126} Tony Cifani testified that Shelly had "been the contractor to Perk Company on many occasions[.]" (Tr. 517.) He stated that Perk asked Shelly to take over asphalt work for N.E.S. on the Lake Avenue project "when N.E.S. could not perform the work, didn't have the employees, didn't have the credit to get asphalt

anymore or trucking[.]" (Tr. 517.) According to Tony Cifani, Shelly agreed to complete the work. He testified that N.E.S. could not complete the work because it "was insolvent at the time." (Tr. 517.) He testified that he was not the owner of N.E.S. — conceding, however, that "theoretically they could say maybe I was 20 percent[]" — but stated he was still liable under any bonds and for loans he cosigned for N.E.S. (Tr. 517-518.)

{¶ 127} Turning to the Auburn project, Tony Cifani testified that Perk was the prime contractor and subcontracted the asphalt work to N.E.S. (Tr. 519.) He stated:

> Perk had no involvement whatsoever with the Auburn project with Shelly. N.E.S. bought their own materials, did their own trucking and did their own installation for Auburn. Perk never was a party with Shelly on this project.

(Tr. 519.) He identified exhibit J2 as the purchase order between Shelly and N.E.S. for the purchase of material from Shelly on the Auburn project and testified that no individual listed worked for Perk. (Tr. 520.) Tony Cifani stated that Perk maintained a bond on the project as general contractor, but that Shelly never filed a notice of furnishing. He further testified that N.E.S. completed its work under the Auburn subcontract and that N.E.S. was paid for its work. (Tr. 521.)

{¶ 128} Next, Tony Cifani testified that with respect to the Lake Avenue project, and ODOT project, N.E.S. "did not have enough qualification to purchase the materials for this project." (Tr. 521-522.) As a result, "Perk Company went into an agreement with Shelly Corp. to purchase the materials only." (Tr. 522.) Asked to explain what he meant by "materials only," Tony Cifani testified that it excluded items like trucking or installation. (Tr. 522.) He testified that Perk purchased the

material so that "N.E.S. could pick it up, haul it to the project, and install it." (Tr. 523.) According to Tony Cifani, Perk performed none of the hauling or installation. (Tr. 523.) Turning to invoices, he testified that they were between Shelly and N.E.S. "for hauling asphalt only." (Tr. 523.) Perk was invoiced for the materials and "[p]aid it in full." (Tr. 523.)

{¶ 129} Tony Cifani stated that no invoices had been issued to Perk for trucking on behalf of N.E.S. (Tr. 523-524.) He testified:

> [T]his was pure — these invoices that are open are in N.E.S.'s name. They are for hauling only, which was N.E.S.'s responsibility. Has nothing to do with the purchase order Perk signed with Shelly Corp. for the FOB material.

(Tr. 524.) Shelly, however, was a replacement contractor on the Lake Avenue project, which N.E.S. could not complete. Tony Cifani testified that Perk "paid Shelly for their installation of the work, the material they bought, and everything associated with their subcontract." (Tr. 524.) He identified exhibit X as a lien waiver from Shelly with respect to the Lake Avenue project and testified that all materials purchased for the project had been paid for. (Tr. 524-527.)[8]

{¶ 130} Tony Cifani identified exhibit E as an accounts payable invoice history from Perk's accounting system indicating a zero balance due to Shelly for the Auburn, Lake Avenue, Union Avenue, and U.S. 322 projects and further showing the invoice number, the check number, and the amount paid to Shelly. (Tr. 527-530.)

---

[8] As discussed below, Shelly later dropped its claim for recovery on the Lake Avenue project.

{¶ 131} Tony Cifani went on to identify additional subcontracts related to the relevant projects. He further testified that the open invoices between Shelly and N.E.S. reflected Shelly invoicing N.E.S., principally for hauling materials. (Tr. 530-532.)

{¶ 132} Testimony next turned to the fall of 2021 and his involvement in the inner workings of N.E.S. Tony Cifani testified that Bojec and Helf "basically disappeared. . . . They quit, you know, showing up. They quit any concern about N.E.S." (Tr. 533.) He testified that he "basically became the mop up man[]" because Bojec had started another company while Tony Cifani "was left as a guarantor on the bonds, and to the bank[.]" (Tr. 533.) He went on to identify emails from September 2023 and July 2022 that he sent expressing concerns over ensuring that the banks and subcontractors were paid, with the September 2023 email to Bojec noting that "N.E.S. owes Perk a vast amount of money for both loans and the subcontract work." (Tr. 534.) The July 2022 email to Bojec and Helf indicated they needed to come up with a plan to "collect $100,000 for Shelly by the end of the month." (Tr. 535.) Tony Cifani testified he did not receive responses to his emails.

{¶ 133} Tony Cifani testified that after "John and Gary quit coming to the office" in the fall of 2021, he "took over signing some checks" on behalf of N.E.S. (Tr. 536.) He testified that he "took over trying to collect their money, to do their punch list, to finish out the projects[,]" and "hired subcontractors to finish their work." (Tr. 536.) Tony Cifani claimed he "paid all the bonded liabilities first[,]" but there was not enough money left over to pay everyone, including Perk, which he

testified was owed money because it "was loaning money to N.E.S." and had done "a lot of subcontract work for N.E.S. and never got paid." (Tr. 536-537.)

{¶ 134} Testimony next turned to the March 15, 2023 check made payable to Perk from N.E.S. in the amount of $250,243.35, which had been a subject of Tony Cifani's earlier cross-examination when he was called during Shelly's case-in-chief. Tony Cifani identified exhibit Z as a "history report" that explained why the N.E.S. check had been written to Perk. Shelly objected that exhibit Z had not been turned over during discovery. The parties argued the matter briefly and the trial continued after a short recess. The Perk Defendants' counsel argued that this record had not been requested in discovery and that they only learned of the need for it after Shelly sifted through thousands of checks that had been produced and then picked a few to use in cross-examining Tony Cifani:

> [W]e didn't know what — there's thousands of checks. They asked for years. There's thousands of checks. We didn't know out of the haystack what needles he was going to pull out. We learned during direct exam [sic, Cifani's testimony when called on cross-examination] and that's why you see a print date of the other day. We have this printout from every single check that was ever issued from this company. This is a sophisticated company with sophisticated software. They have this. We just printed it off to say, "Hey, why did you do this?"

(Tr. 541-542.) In response, Shelly argued that the document fell within the scope of their broad discovery requests and that any claim by the Perk Defendants that they just learned the purpose of the bank records was something that could have been resolved if CF Bank had complied with the subpoena issued to it. "Instead, we received documents three weeks ago and had to plow through them." (Tr. 543.) The Perk Defendants responded: "Again, we are not mind readers, so we couldn't know

what they were going to bring up as far as which check or which checks." (Tr. 544.)

The Perk Defendants argued that because the checks had been admitted, Tony Cifani "has to have an opportunity to explain them[,]" even if exhibit Z was ultimately merely placed before him to refresh his recollection. (Tr. 544.)

{¶ 135} Testimony continued, with Tony Cifani testifying that the check for $250,243.35 reflected in Shelly's exhibit No. 57 was issued from N.E.S. to Perk "to repay Perk Company some loans and some invoices they paid on N.E.S.'s behalf." (Tr. 545-546.) Using exhibit Z, Tony Cifani testified:

> $5,000 was a repayment of a loan issued in nine of [2022].
>
> $1,837.50 was a payment Perk Company made on N.E.S.'s behalf to MBG Advisors, who was their accountant.
>
> There's another check for $26,000 that was a reimbursement for Connick Law, which was a lawsuit N.E.S. had with Pratt Trucking that Perk Company paid Connick Law for.
>
> There's another check for Russell Standard we paid on N.E.S.'s behalf for $16,283.64.
>
> And then there was a loan payment payoff that N.E.S. — that Perk Company made for — this was the line of credit to CF Bank for $201,122.21. Those amounts equals $250,243.35.

(Tr. 547.) Using exhibit AA, Tony Cifani also offered a breakdown of the $49,000 check from N.E.S. to Perk issued on March 22, 2023:

> $410.81 was a fuel bill N.E.S. owed Perk. $1,597.52 was a bill. Again, another fuel bill paid on Perk's behalf. The balance was $46,991.67 that Perk had paid N.E.S.'s accountants to do tax returns. Totals $49,000.

(Tr. 547-548.) Tony Cifani likewise identified exhibit V as a check in the amount of $1,015.29 from N.E.S. to Perk dated August 4, 2021: "It was a repayment $801.80

for Cleveland Carting, which was an invoice from N.E.S. and $213.49 was reimbursement for Ohio Pipe & Valves, the supplier." (Tr. 548.)

{¶ 136} Tony Cifani further testified that he had caused N.E.S. to pay Shelly over $1.2 million for projects unrelated to Perk jobs and that this occurred "before [he] paid Perk Company any money" from N.E.S. accounts. (Tr. 549.) He also stated that even though, in his view, he never became a shareholder of N.E.S., he continued to pay money from its accounts "to make sure that every . . . obligation was fulfilled that had any potential bond claims or bank defaults[.]" (Tr. 551.) He claimed that Perk was still owed approximately $1.4 million from N.E.S. (Tr. 552.)

{¶ 137} In response to a question from the trial court, Tony Cifani conceded that he was operating both companies at the same time. (Tr. 551.)

{¶ 138} On cross-examination, Tony Cifani conceded that N.E.S. did not observe corporate formalities. (Tr. 554-555.) He agreed that exhibit No. 55 was a July 28, 2020 account agreement with CF Bank listing N.E.S., himself, and Joe Cifani as account owners. (Tr. 556-557.) This was five days after execution of the stock-purchase agreement that he signed indicating he was "secretary and clerk of the above-named corporation organized under the laws of Ohio[.]" (Tr. 557-558.) He further signed to indicate he was a "beneficial owner" of N.E.S., which the document defined as "either any individual who owns 25 percent or more of the company, or an individual who has a significant managerial responsibility for the company[.]" (Tr. 560-562.)

{¶ 139} Tony Cifani was next confronted with exhibit No. 63, an email chain with CF Bank beginning with an email he sent on July 24, 2020, to various CF Bank employees, with copies to individuals at Perk and N.E.S. The subject was listed as "opening bank account NES CORP," and the email purported to enclose forms requested by CF Bank. (Tr. 563-564.)

{¶ 140} Shelly next walked Tony Cifani through a CF Bank statement indicating that the checks for $250,243.35 and $49,000 from N.E.S. to Perk landed in Perk's bank account in March 2023. (Tr. 566.) Shelly asked Tony Cifani to confirm that this was shortly after Perk filed its answer in February 2023. (Tony Cifani could not confirm, but the docket reflects that the Perk Defendants' answer to Shelly's first amended complaint was filed on February 24, 2023.)

{¶ 141} Tony Cifani conceded that while he claimed there had been a loan from Perk to N.E.S., it was not documented in the way a bank would typically document a loan. (Tr. 571.) He stated that he "documented when we wrote the checks what it was for, and N.E.S. recorded it in their accounting for what it was for." (Tr. 571.) Tony Cifani testified: "I'm not a bank. I didn't fill out a 50 page form for it, no." (Tr. 571.) He conceded there was no promissory note from N.E.S. (tr. 571-572), but did insist that exhibit Z documented a "loan" and that the vendor was specified as N.E.S. (Tr. 576.) He further admitted that while the exhibits reviewed on direct indicated loans to N.E.S. by Perk in June through September 2022, he did not cause N.E.S. to repay Perk until February 2023, after Perk had been added to

the litigation and had answered. (Tr. 572-573.) Tony Cifani claimed that he made the transfers "[a]fter all of the other bonded claims were done[.]" (Tr. 573.)

{¶ 142} Shelly next attacked Tony Cifani's claim that Bojec had essentially absented himself from N.E.S.'s offices by walking Tony Cifani through several checks signed by Bojec in September through December 2021.[9] Finally, Shelly established on cross-examination, using exhibit No. 78, that the N.E.S. checking account with CF Bank now had a balance of zero.

{¶ 143} On redirect, Tony Cifani clarified what he meant when he indicated to the court that he had been operating N.E.S. He testified that N.E.S. was not doing any asphalt work at that time, taking new accounts, ordering new materials, or otherwise operating on a day-to-day basis. Instead, Tony Cifani was wrapping up operations because "Gary [Helf] went to Florida and John [Bojec] started a new company, Geauga Highway." (Tr. 602.) Tony Cifani began writing almost all of the checks, he testified, for the following reasons:

> We tried to collect all of the receivables I could collect. I tried to pay all of the people that had bond claims out there. I tried to protect all of the people that signed personally, including John Bojec, Gary Helf, myself and my brother.
>
> We tried to do the right thing and get as many people paid as possible. That's what I tried to do.

(Tr. 601.)

---

[9] Shelly suggested that either Bojec was present and signing checks or that his signature had been forged.

**{¶ 144}** Tony Cifani further testified that while the checks written to Perk by N.E.S. that were at issue were written in March 2023, the loans were made "[m]onths and years before[,]" with notations made "in the accounting system of both companies[.]" (Tr. 603-604.)

**{¶ 145}** On re-cross, Tony Cifani admitted that despite the litigation having dragged on for some three years, Perk had not produced any check stubs documenting loans to N.E.S. (Tr. 604-605.)

**{¶ 146}** The defense rested subject to the admission of exhibits.

## D. Shelly Rebuttal

**{¶ 147}** Shelly called one witness, Bojec, on rebuttal. Bojec identified certain checks included within exhibit R — CF Bank records from 2021 — as bearing his signature: "Some do. It's a little hard for me to read. It's pretty small. I mean, some do. The ones I could make out." (Tr. 608.) Turning to check number 2669, however, Bojec indicated that the signature was not his. (Tr. 609.) With respect to check number 2758, however, he stated: "I can't read that small. . . . I mean, it could be. I wouldn't say it's not, but — [.]" (Tr. 610.)

**{¶ 148}** Shelly interrupted Bojec's answer to move on to exhibit S, CF Bank records from 2022. He testified that check number 3040, written January 11, 2022, bore his signature, or at least appeared to: "I'm going to say it looks like it could be, yes." (Tr. 611.) He responded similarly with respect to check number 3054, indicating that the signature appeared to be his but also testifying that he did not recall signing a check in January 2022: "I mean, it appears, but, I mean, it's not

exact. I guess I'm trying to compare it to my other signatures. Close. I just — I could tell you right now I don't remember signing a check in January." (Tr. 611.)

{¶ 149} Further into exhibit S, however, Bojec identified several checks written from early 2022 into November 2022 that appeared to have signatures beginning with the initials "J" and "B" but were not written by him. (Tr. 612-616.) He likewise indicated that the check included in exhibit No. 91, dated July 29, 2022, and which has a signature that appears to be names beginning with "J" and "B," likewise did not reflect his actual signature and was written at a time when he was not conducting business on behalf of N.E.S. (Tr. 617.)

{¶ 150} On cross-examination, the Perk Defendants confronted Bojec with exhibit OO, a December 19, 2022 email in which he claimed to still maintain his position as president of N.E.S. (Tr. 619.) But he denied recalling ever asking others, such as Gary Help of Jackie Cifani, to sign his name. (Tr. 619.)

{¶ 151} The Perk Defendants suggested that none of the checks bearing Bojec's purportedly forged signature had been made out to either an N.E.S. shareholder or to Perk. The trial court itself observed that none of the relevant checks appeared to be made out to Perk. Shelly stipulated only that "whatever they're made out to, they're made out to." (Tr. 622.)

{¶ 152} Bojec essentially conceded, in reviewing exhibit S, that it appeared certain checks not bearing his signature (forged or otherwise), were written from N.E.S. to Shelly in substantial amounts. This included check number 3086 in the

amount of $52,124.70 and check number 3107 in the amount of $92,708.81. (Tr. 622-623.)

### E. Conclusion of Trial, Post-Trial Submissions, the Trial Court's Judgment, and Relevant Post-Trial Proceedings

{¶ 153} The trial court then turned to the admission of the Perk Defendants' exhibits. The trial court admitted exhibit X, the Shelly lien waiver regarding the Lake Avenue project, over Shelly's strenuous objection that despite being a document generated by Shelly, it was not produced by the Perk Defendants in the course of discovery. (The Perk Defendants likewise argued that Shelly had not produced it in discovery.) Shelly likewise offered additional exhibits. The trial court essentially admitted all offered exhibits with the proviso that it would determine relevance and other evidentiary issues after taking the matter under advisement.

{¶ 154} The trial court ordered the parties to submit proposed findings of fact and conclusions of law, memorializing that directive in a journal entry dated March 4, 2025, that also denied the Perk Defendants' motion for a directed verdict. Both sides submitted their proposed findings and conclusions on March 17, 2025. In accordance with the trial court's directive at the close of the trial, the Perk Defendants also submitted a bench brief addressing exhibit D, the Shelly statement to Perk for $68,320.99 purportedly stemming from finance charges and unearned discounts. Shelly also filed detailed objections to the Perk Defendants' proposed findings and conclusions on March 31, 2025.

{¶ 155} The trial court entered its decision on May 21, 2025, adopting Shelly's proposed findings of fact and conclusions of law with only minor changes.

While the findings relevant to this appeal will be discussed in more detail in connection with associated assignments of error, we briefly summarize the trial court's final judgment.

{¶ 156} On Count I, breach of contract between Shelly and Perk, the trial court entered judgment in favor of Shelly and against Perk in the amount of $357,492.49 plus contractual interest from the date of trial and legal fees.[10]

{¶ 157} On the same count for breach of contract between Shelly and N.E.S., it entered judgment in favor of Shelly and against N.E.S. in the amount of $643,674.56 plus contractual interest from the date of trial and legal fees.

{¶ 158} On Count II, unjust enrichment, the trial court entered judgment for Shelly and against Perk in the amount of $643,674.56.

---

[10] The trial court's decision, like Shelly's proposed findings and conclusions, uses two different numbers for the principal amount due on the Auburn project. The table contained in paragraph 96 of the findings of fact lists a principal amount of $145,434.88, which is consistent with Shelly's exhibit No. 54. The table contained in paragraph 24 of the conclusions of law, however, lists a principal amount owed of $146,434.88 (i.e., inflated by exactly $1,000 because of an apparent typographical error). That same table, however, specifies interest on the Auburn project in the amount of $92,641.27, with an Auburn total calculated as $238,076.15. That final total is actually the sum of the correct Auburn principal and the specified interest. In other words, the typographical error as to principal did not carry through to the grand total. Given our resolution of the case, any discrepancy is a moot point.

Nevertheless, each time the amount of $357,492.49 is specified in the conclusion of the trial court's judgment entry — reflecting an award of that sum plus contractual interest — that number is incorrect. The trial court awarded $357,492.49 "plus contractual interest from the date of trial[.]" The trial court's findings and conclusions, however, consistently state that the figure of $357,492.49 is an amount that already includes interest from the date of trial. *See, e.g.,* findings of fact paragraphs 57 and 88 and conclusions of law paragraphs 24 and 41.

{¶ 159} Again, adopting Shelly's proposed findings of fact and conclusions of law, specifically conclusion of law paragraph 28, fn. 4, the trial court entered no separate judgment as to Count III, action on account.

{¶ 160} On Count IV, based upon Perk's liability for breach of contract under Count I, the trial court entered judgment in favor of Shelly and against Tony Cifani on the personal guaranty, awarding Shelly the amount of $357,492.49 plus contractual interest from the date of trial and legal fees.

{¶ 161} On Count V, based upon Perk's liability for breach of contract under Count I, the trial court entered judgment in favor of Shelly and against Hudson on the payment bond in the amount of $357,492.49 plus interest from the date of trial.

{¶ 162} On Count VI, the trial court found that N.E.S.'s corporate form could be disregarded and the individual assets of Tony Cifani could be reached to satisfy the judgment against N.E.S.

{¶ 163} The trial court's entry further stated, at four separate locations, that "Shelly shall submit evidence of its legal fees and costs incurred within 30 days from the date of this order."

{¶ 164} The Perk Defendants filed a notice of appeal on June 9, 2025. The following day, June 10, Shelly filed an affidavit in support of attorney fees. On June 11, 2025, this court dismissed the appeal sua sponte for lack of a final appealable order because the trial court had not issued a ruling on attorney fees and its judgment entry did not contain Civ.R. 54(B) language.

{¶ 165} Briefing on collection issues followed, including a motion to stay enforcement of the judgment and a motion for a debtor's examination of Tony Cifani. Neither issue is pertinent to this appeal, except to the extent that in one reply brief filed June 29, 2025, the Perk Defendants appear to assume that the trial court intended to schedule a hearing on the issue of attorney fees. That reply brief mentions an anticipated hearing multiple times, including the statement that "the resolution of the attorney's fee award remains open with an upcoming hearing that has not yet been set."

{¶ 166} On July 2, 2025, however — 22 days after Shelly filed its fee affidavit — Shelly filed a "notice of unopposed application" for attorney fees and costs, along with a proposed order requesting fees in the grand total of $332,870.83. Shelly argued that the Perk Defendants incorrectly assumed that there would be a fee hearing and, in the meantime, had missed the deadline for opposing the fee application (which we note was captioned as an "affidavit" rather than an application or motion). Three business days later, on July 8, 2025, the trial court docketed a journal entry granting the fee application as unopposed and awarding fees in the requested sum of $332,870.83.

{¶ 167} On July 14, 2025, the Perk Defendants filed a motion to vacate the fee order pursuant to Civ.R. 60(B)(1) and (5) and for the court to schedule an evidentiary fee hearing. Shelly opposed the motion on July 28, 2025, and the Perk Defendants filed a reply brief on August 4, 2025.

{¶ 168} On the same day they filed their reply brief, August 4, 2025, the Perk Defendants filed a motion for judgment notwithstanding the verdict or new trial. Two days later, they filed a notice of appeal. Briefing on the motion for judgment notwithstanding the verdict or new trial continued while the appeal remained pending. On August 22, 2025, this court granted in part the Perk Defendants' motion for a limited remand to permit it to rule on the pending motion to vacate, motion for new trial, and motion for judgment notwithstanding the verdict. Briefing on the Perk Defendants' motion for judgment notwithstanding the verdict or new trial was completed on September 2, 2025.

{¶ 169} On September 22, 2025, the trial court docketed an entry denying the motion to vacate the award of attorney fees and further denying the motion for judgment notwithstanding the verdict or for a new trial. The same journal entry addressed other aspects of the case not pertinent to this appeal, such as the Perk Defendants' motion to stay execution and the posting of a supersedeas bond.

{¶ 170} The Perk Defendants filed another notice of appeal on October 7, 2025. 8th Dist. Cuyahoga Nos. 115409 and 115668 were thereafter consolidated for briefing, hearing, and disposition.

## III. Assignments of Error

{¶ 171} Appellants present nine assignments of error for our review. They are listed here:

> Assignment of Error I: An abuse of discretion was committed to defendant-appellants' detriment when the trial court accepted and relied upon hearsay testimony about a purported revision to an N.E.S. purchase order, to which no applicable exception was ever identified.

Assignment of Error II: The trial court erred by refusing to grant judgment as a matter of law upon plaintiff-appellees' claim for breach of contract against defendant-appellants.

Assignment of Error III: The trial court erred by refusing to grant judgment as a matter of law upon plaintiff-appellees' claim of unjust enrichment against defendant-appellants.

Assignment of Error IV: The trial court erred as a matter of law by entering judgment against defendant-appellant, Anthony Cifani, upon plaintiff-appellees' piercing the corporate veil theory

Assignment of Error V: The trial court erred, as a matter of law, by imposing judgment against defendant-appellant Hudson Insurance Company notwithstanding plaintiff-appellee's admitted failure to properly serve notices of furnishing.

Assignment of Error VI: The trial court erred as a matter of law, and otherwise committed an abuse of discretion by failing to grant the alternative motion for a new trial.

Assignment of Error VII: The trial court's findings of fact are contrary to the manifest weight of the evidence.

Assignment of Error VIII: The trial court erred as a matter of law and otherwise committed an abuse of discretion by expecting defendant-appellants to formally oppose a non-existent motion for attorney fees and then granting said motion sua sponte.

Assignment of Error IX: The trial court erred as a matter of law, and otherwise committed an abuse of discretion, by refusing to vacate the attorney fee award on the grounds of mistake in accordance with Civ.R. 60(B)(1) & (5).

{¶ 172} For ease of analysis, we address some of the Perk Defendants' assignments of error together. Finding some merit to the appeal, we affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## IV. Analysis

### A. First and Second Assignments of Error

{¶ 173} We address the Perk Defendants' first and second assignments of error together because both pertain to contractual liability for the three projects — Union Avenue, U.S. 322, and Auburn — that remained at issue after Shelly conceded it was not entitled to further recovery on the Lake Avenue project. In their first assignment of error, the Perk Defendants argue that the trial court abused its discretion by accepting and relying upon hearsay testimony concerning a claimed revision to the Auburn purchase order where no hearsay exception was identified. In their second assignment of error, the Perk Defendants argue that the trial court erred by refusing to grant judgment as a matter of law on Shelly's claim for breach of contract.

{¶ 174} We fully sustain the first assignment of error and find merit to the second assignment of error as it relates to the Auburn project. Accordingly, we reverse the trial court's finding that the Perk Defendants bear any contractual responsibility for the outstanding amounts due under the Auburn purchase order but find that the trial court properly imposed contractual liability for the Union Avenue and U.S. 322 projects. We remand the case to the trial court as specified below.

{¶ 175} We first address the trial court's purported reliance on hearsay concerning the Auburn purchase order. "A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and

whether it is admissible hearsay." *In re A.M.*, 2022-Ohio-612, ¶ 22 (8th Dist.), citing *Solon v. Woods*, 2014-Ohio-5425, ¶ 10 (8th Dist.). "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion." *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239 (1984). A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 64 (8th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). *See also State v. McAlpin*, 2026-Ohio-148, ¶ 14.

{¶ 176} "However, 'courts lack the discretion to make errors of law[.]'" *Id.* at ¶ 14, quoting *Johnson* at ¶ 39. Accordingly, "[w]e review questions of law de novo." *McAlpin* at ¶ 14, citing *Johnson* at ¶ 38.

{¶ 177} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible unless it falls within an exception under the rules of evidence. *State v. Lucas*, 2024-Ohio-842, ¶ 38 (8th Dist.), citing Evid.R. 802, 803, and 804.

{¶ 178} The Auburn purchase order lists N.E.S. as the customer, contains N.E.S.'s customer number, and was signed by N.E.S. estimator Craig Ronyak. There appears to be no dispute that Craig Ronyak was at all times employed by N.E.S. rather than Perk. Over the Perk Defendants' hearsay objection, however, Trafficante

testified that while the Auburn Purchase order specified N.E.S. as the customer, "it was called in to change to Perk[]" and that the handwritten annotations on the purchase order reflected a customer change from N.E.S. to Perk "per Craig R." (Tr. 66 and 132.) Trafficante stated that the handwriting was that of an unidentified Shelly "billing clerk[.]" (Tr. 132.) The unidentified billing clerk who made the handwritten notation never testified. The trial court asked Trafficante whether he had been "part of this transaction[,]" and he responded, "No." (Tr. 138.)

{¶ 179} During his testimony, Trafficante appeared to be under the impression that Craig Ronyak — who had not yet testified — was a Perk employee rather than an employee of N.E.S. (Tr. 132-133.) Moreover, as noted above, Trafficante admitted he had not participated in any conversations pertaining to a customer change on the Auburn purchase order and therefore had no direct knowledge of who had purportedly "called in" to change the customer from N.E.S. to Perk. Trafficante had evidently merely assumed it was Craig Ronyak who spoke to the unidentified Shelly billing clerk. As the Perk Defendants aptly state, he essentially testified "that someone he cannot name from another company gave a verbal instruction to someone other than himself that somehow created a legal responsibility[.]" (Perk Defendants' brief at p. 17.)

{¶ 180} On appeal, Shelly argues that because the trial court accepted the annotated Auburn purchase order as authentic, it was either not hearsay at all or satisfied the business-records exception. Shelly's reliance on *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2020-Ohio-353, and *JLJ Inc. v. Rankin*

*& Houser, Inc.*, 2010-Ohio-3912, ¶ 41 (2d Dist.), is unpersuasive. In discussing the Ohio Supreme Court's holding in *Columbus City Schools Bd. of Edn.*, Shelly conflates the Court's holding regarding a purchase agreement with its holding regarding a separate settlement statement. As to the former, the Court held that an authenticated purchase agreement was not hearsay at all, but rather the "best evidence" of the existence of a contract. *Columbus City Schools Bd. of Edn.* at ¶ 25. It cited *JLJ Inc.*, in which the Second District observed that "[t]he existence of the contract, not assertions of fact stated therein, was the matter sought to be proven by offering the contract in evidence." *JLJ Inc.* at ¶ 41.

{¶ 181} The Ohio Supreme Court next considered the settlement statement. While it found that the settlement statement contained hearsay, it concluded that the settlement statement satisfied the business-records exception. *Columbus City Schools Bd. of Edn.* at ¶ 26, citing *HealthSouth Corp. v. Testa*, 2012-Ohio-1871, ¶ 20, citing Evid.R. 803(6).

{¶ 182} Here, neither side disputes the existence of a contract for the provision of asphalt. But the purchase order, a typewritten document, specifies N.E.S. as Shelly's customer and is signed by an N.E.S. employee. The critical fact required to impose contract liability on Perk was not merely that Shelly had a business record in its files, but rather that the N.E.S. purchase order for Auburn was validly changed into a Perk purchase order before contract formation.

{¶ 183} The trial court did not abuse its discretion by admitting exhibit No. 4 for what it was, i.e., a document maintained in Shelly's files. The document could

be authentic as a Shelly file record, however, and still not prove that Perk made or authorized the handwritten change. In that regard, Shelly did not present any nonhearsay evidence that an authorized Perk representative assented to the substitution. The trial court instead treated the barely legible handwritten annotations and Trafficante's secondhand explanation of those annotations as competent proof that Perk, through an authorized representative, assented to becoming the buyer on the Auburn purchase order. This was erroneous. The key question was whether Perk had been substituted for N.E.S. for the Auburn purchase order, and the only evidence of that occurring was barely legible hearsay handwriting purportedly reflecting a customer change from N.E.S. to Perk, with no corresponding signature by any Perk representative. Trafficante did not personally receive that instruction, did not know who gave it, and did not appear to know who Craig Ronyak was.

{¶ 184} In other words, Trafficante's testimony that the substitution was authorized by Perk was based on hearsay. The Auburn purchase order annotations were offered for the truth of the matter asserted, i.e., that someone with authority caused N.E.S. to be replaced by Perk as the contracting purchaser. This, combined with Trafficante's testimony that Shelly was somehow notified to change N.E.S. to Perk, was the operative fact relied on by the trial court to impose contractual liability on Perk for the Auburn purchase order.

{¶ 185} In fact, the record suggests multiple hearsay layers. An unknown source (possibly, though not necessarily Craig Ronyak) allegedly communicated a

change, an unidentified Shelly employee allegedly wrote the notation, and Trafficante was never a part of the chain, i.e., he could not testify to any personal knowledge regarding the purported change.

{¶ 186} Evid.R. 805 requires each layer of hearsay to satisfy an exception. It states: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." *Id.* In *Spencer v. Lakeview School Dist.*, 2006-Ohio-3429 (11th Dist.), the Eleventh District recognized that hearsay contained within a business record may properly be excluded where a testifying witness cannot identify the source of information. In that case, the court found that information contained within the notes of a school nurse regarding circumstances surrounding a minor's death were properly excluded by the trial court because "the final element of Evidence Rule 803(6) regarding trustworthiness that was not met." *Id.* at ¶ 39. More specifically, the nurse "could not testify as to which person specifically gave her what information." The Eleventh District explained:

> [T]he nurse received information from not only [the gym teacher], but also the nurses who were not present at the time of [the decedent's] request [to retrieve his prescription asthma inhaler]. The appellants' argument is circular in its reasoning that because [the gym teacher] was the only person with this first-hand knowledge, then it must have been he who provided the same to Nurse Tomsich. That is not true. Much as in the old childhood game of "telephone," [the gym teacher] could have relayed information to the other nurses who then relayed their perception of [the gym teacher's] account to Nurse Tomsich. It is precisely this "telephone" chain of communication which the hearsay rule means to exclude due to its lack of reliability.

*Id.* at ¶ 39.

{¶ 187} In the present case, the trial court's findings of fact and conclusions of law nowhere grapple with the hearsay aspects of the Auburn purchase order. The trial court did not find that the business-records exception or any other hearsay exception applied to salvage the handwritten annotations on the purchase order. We agree with the Perk Defendants that the trial court committed an error of law in this regard.

{¶ 188} In addition to the hearsay issues as to the handwriting and Trafficante's associated testimony, Shelly's argument that legal responsibility for the Auburn purchase order shifted from N.E.S. to Perk pursuant to an oral modification is arguably barred by the integration clause contained in Shelly's standard terms and conditions for material sales included with each generated purchase order:

> 9. **_Modification._** No amendment or modification of this Order shall be valid or enforceable unless in writing and signed by the party sought to be charged, and no prior or current course of dealing between the parties, or any usage of trade or custom of the industry shall modify or supplement the terms and conditions of this Order.

(Emphasis and underscore in original.) "Ohio law is very clear that a contract that expressly provides that it may not be amended, modified, or waived except in writing executed by the parties is not subject to oral modification." *Kelley v. Ferraro*, 2010-Ohio-2771, ¶ 39 (8th Dist.) (collecting cases). Regardless of whether the contract was formed when Craig Ronyak inked the purchase order or (as Shelly contends) when it began performance, there is no signed writing from any Perk representative.

{¶ 189} Shelly argues that any error in assigning contract liability to Perk under the Auburn purchase order is harmless because even if no contract was

formed between Perk and Shelly, (1) Shelly could recover the unpaid same damages from Perk and Tony Cifani under its unjust-enrichment claim; and (2) Shelly can recover the same damages against Tony Cifani by piercing N.E.S.'s corporate veil to reach Tony Cifani. We address these separate harmless-error contentions in reverse order.

{¶ 190} First, as discussed below in connection with the Perk Defendants' fourth assignment of error, we vacate the trial court's judgment as to veil piercing on procedural grounds and remand for further proceedings consistent with this opinion. Accordingly, because the issue has yet to be properly tried, we cannot accept Shelly's contention that the trial court's contract-formation error as to the Auburn purchase order was harmless.

{¶ 191} Second, we acknowledge that Shelly's trial counsel made remarks at trial to the effect that relief through unjust enrichment would be available to Shelly as to the disputed purchase orders, including Auburn, if the trial court determined that no contract breaches occurred. (Tr. 421.) We further acknowledge that the trial court made specific factual findings consistent with an unjust enrichment theory as to the Auburn project (as well as Union Avenue and U.S. 322). The trial court found, for example, that Shelly's materials were not defective and were incorporated into the Auburn project, that Perk successfully completed Auburn and had been paid in full, that Shelly was not paid in full, and that Perk "presented no competent, credible, admissible evidence" that it had paid N.E.S. for the materials. (Findings of fact and conclusions of law at p. 12, ¶ 83.)

{¶ 192} Unlike the issue of veil piercing, however, there was no discussion at trial or in the trial court's judgment regarding whether any claim for unjust enrichment as to the Auburn project was tried by express or implied consent pursuant to Civ.R. 15(B). *See Berkut, Inc. v. Devolver Corp.*, 2024-Ohio-63, ¶ 20 (8th Dist.) (Where a "claim was not set forth in the pleadings or tried by express or implied consent of the parties, it was not properly before the court for determination."). Indeed, both below and on appeal, Shelly's claim for unjust enrichment was explicitly directed to the residual N.E.S. invoices reflected in exhibit No. 53. In its brief on appeal, Shelly specifically states that "[t]he four purchase orders that Perk issued to Shelly," which includes Auburn, "are not at issue in the unjust enrichment claim." (Perk Defendants' brief at p. 21, fn. 2.) Instead, Shelly goes on to explain, "the Perk Purchase Orders are the subject of Shelly's claim for breach of contract against Perk[,]" and "[i]t is the remaining purchase orders issued to Shelly—which were issued by NES—that the unjust enrichment claim addresses." *Id.* Shelly's two trial briefs likewise framed Auburn as a breach-of-contract claim rather than falling within its unjust-enrichment claim.

{¶ 193} Furthermore, despite the referenced findings by the trial court that might ultimately be tied to an unjust-enrichment award, the trial court did not award damages in connection with the Auburn project under an unjust-enrichment theory. The court treated Union Avenue, U.S. 322, and Auburn as "Perk Purchase Orders" for breach-of-contract purposes under Count I, then subtracted those amounts from the N.E.S. aged-analysis total in exhibit No. 53 to arrive at the

$643,674.56 unjust-enrichment amount under Count II.  All of this is accurately reflected in the table appearing at pages 10-11 of Shelly's brief on appeal.  The trial court awarded damages under Auburn pursuant to Shelly's contract, bond, and guaranty theories rather than on an unjust-enrichment theory.

{¶ 194} Accordingly, we reject Shelly's harmless-error argument.  Instead, in light of the entire record, including remarks made during trial and the trial court's findings that might support an award of damages under an unjust-enrichment theory with respect to the Auburn project, we order a limited remand.  Specifically, we remand for the trial court to determine in the first instance whether an unjust-enrichment theory as to Auburn was actually tried by consent and, if so, whether judgment can be entered on that alternative theory without reopening the trial to take additional evidence.[11]

---

[11] We reject the Perk Defendants' argument (raised in their third assignment of error but not addressed by us in resolving it) that no unjust-enrichment claim can arise because of the existence of exhibit No. 1, the customer account agreement between Shelly and Perk. "Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter." *Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363, ¶ 36.  The Perk Defendants' theory of the case, however, is that no contract between Shelly and Perk covered the same subject matter as the Auburn Project, i.e., that Shelly contracted with N.E.S. on Auburn and that Perk never assented to a contract — an argument we have found persuasive.  But the Perk defendants cannot have it both ways, contending both that no Shelly-Perk contract had been formed as to Auburn and also that Shelly cannot seek relief on the alternative theory of unjust enrichment because there was a contract.  The case instead falls into the category of actions in which a subcontractor attempts to reach an upper-tier contractor or owner through an unjust-enrichment claim precisely because of the absence of privity of contract.  *See, e.g., VMI Group, Inc. v. Capstone Constr. Co., L.L.C.*, 2023-Ohio-3882 (8th Dist.); *Sterling Contracting, LLC v. Main Event Ent., LP*, 2022-Ohio-2138 (8th Dist.); *Meridien Marketing Group v. J&E Bldg. Group, Inc.*, 2011-Ohio-4872 (2d Dist.); *Booher Carpet Sales v. Erickson*, 1998 Ohio App. LEXIS 4643 (2d Dist. Oct. 2, 1998).

{¶ 195} With respect to the Perk Defendants' second assignment of error, we find merit to the assignment as to the Auburn project but no error with respect to the Union Avenue and U.S. 322 projects.

{¶ 196} As a preliminary matter, we decline to adopt the Perk Defendants' proposed standard of review. A trial court's denial of summary judgment is reviewed de novo under Civ.R. 56, and such a denial may be reviewed after a subsequent adverse final judgment. *Bliss v. Manville*, 2022-Ohio-4366, ¶ 12-14. Nevertheless, when the denial rested on genuine issues of material fact and the case proceeded to trial on those same issues, any error in denying summary judgment is moot or harmless if the trial proceedings demonstrate factual disputes supporting judgment for the nonmovant. *KeyBank, N.A. v. MRN Ltd. Partnership*, 2011-Ohio-1934, ¶ 29 (8th Dist.). "[W]hen summary judgment is erroneously denied on an issue of law," however, "an ensuing trial does not render the error harmless and the ruling is reviewable." *Id.*, citing *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 156 (1994). *See also COD Properties Ohio, LLC v. Black Tie Title, LLC*, 2025-Ohio-2519, ¶ 116-117 (8th Dist.); *Swoope v. Osagie*, 2016-Ohio-8046, ¶ 82-83 (8th Dist.).

{¶ 197} In short, after a full bench trial, the Perk Defendants cannot obtain de novo review of the trial court's factual findings merely by characterizing their challenge as one to the earlier denial of summary judgment. In *KeyBank*, the trial court had "determined that there were genuine issues of material fact regarding whether appellees were entitled to equitable relief and those issues were resolved at

trial in favor of" the nonmoving party. *KeyBank* at ¶ 31. This court was "not persuaded by appellants' contention that the trial court's decision that equitable principles might apply was based on a question of law and, accordingly, the harmless error principle set forth in *Continental* does not apply." *Id*. at ¶ 32.

{¶ 198} The present case plainly did not end at the summary-judgment stage, and while the trial court did not issue a detailed decision when it denied the parties' cross-motions for summary judgment, our thorough review of the record convinces us that genuine issues of fact remained for trial. The trial court then conducted a bench trial and issued findings of fact and conclusions of law. To the extent the Perk Defendants challenge the trial court's factual determinations after the bench trial, we review those findings under the civil manifest-weight standard. "As to civil judgments, '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Kasick v. Kobelak*, 2009-Ohio-5239, ¶ 15 (8th Dist.), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct." *Kasick* at ¶ 15, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). Accordingly, "an appellate court should not substitute its judgment for that of the trial court when there exists, as in this case, competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." *Seasons Coal Co.* at 80. We do not

second-guess a trial court's credibility findings when it serves, in a bench trial, as the trier of fact. This court has consistently held:

> "The credibility of a witness is primarily for the trier of fact to assess." *Khatib v. Peters*, 2017-Ohio-95, 77 N.E.3d 461, ¶ 28 (8th Dist.). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

*Machen v. Miller*, 2024-Ohio-1270, ¶ 74 (8th Dist.).

{¶ 199} We have already found that the trial court erred as a matter of law by relying upon inadmissible hearsay in determining that Perk was substituted for N.E.S. with respect to the Auburn purchase order. In short, Shelly did not present competent, admissible evidence that Perk assented to that substitution. "The elements of a contract include . . . a manifestation of mutual assent." *Lake Land Emp. Group of Akron, LLC v. Columber*, 2004-Ohio-786, ¶ 14, citing *Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16, citing *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).[12] Without competent evidence that Perk

---

[12] Shelly contends that the Perk Defendants never argued lack of assent at the trial-court level. (Appellees' brief at p. 14-15.) We disagree. The Perk Defendants' proposed findings of fact and conclusions of law cited both *Kostelnik* and *Perlmuter Printing Co.* with respect to the elements of a contract, and further cited *Kostelnik* for the proposition that "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik* at ¶ 16, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). The Perk Defendants then proposed that the court find, with respect to the Auburn project, that Shelly failed to establish that a contract between Perk and Shelly existed because neither Perk nor Tony Cifani "entered into and/or executed any purchase order or contract with [Shelly] for the Auburn Project." (Perk Defendants' proposed findings of fact and conclusions of law at p. 13.)

assented to become the buyer under the Auburn project, Shelly failed to prove the first element of its claim for breach of contract, namely, the existence of a contract between Shelly and Perk as to Auburn. *See, e.g., Re/Max Crossroads Properties v. Roberts*, 2013-Ohio-5575, ¶ 11 (8th Dist.) (The first element of a breach-of-contract claim is that "a contract existed[.]").

{¶ 200} Accordingly, the Perk Defendants' second assignment of error is sustained as to the Auburn project. The trial court's finding that Perk breached a contract with respect to Auburn is reversed. While the parties continue to dispute whether Hudson actually issued a payment bond in connection with the Auburn project, that issue is now moot as to Auburn. Shelly concedes that if contract liability under Count I fails as to Auburn, Hudson's payment-bond liability under Count V is reduced accordingly. (*See* Shelly's brief at p. 11.)

{¶ 201} The Perk Defendants' second assignment of error is overruled, however, with respect to the contractual claims arising from the Union Avenue and U.S. 322 purchase orders. Unlike the Auburn purchase order, both the Union Avenue and U.S. 322 purchase orders identify Perk as the buyer and bear Perk's customer number. Shelly accepted the offers and, when requested, arranged for delivery of the materials. Shelly's standard terms and conditions for material sales, which appear on the back of its purchase orders, specify that "[u]nless otherwise agreed in writing, all materials purchased by Buyer shall be FOB Seller's plant sourcing the order." (*See, e.g.,* exhibit I.) While the Perk Defendants correctly note that the outstanding invoices associated with these projects were directed to N.E.S.,

and that almost all of them were for hauling rather than the materials themselves, there was competent, credible evidence to support the trial court's conclusion that expenses relating to shipment remained the responsibility of the contracting purchaser, i.e., Perk. The purchase orders made the materials FOB Shelly's plant. Under R.C. 1302.32(A)(1), FOB is a "delivery term," and when goods are FOB the place of shipment, the seller bears the expense and risk only of putting goods into a carrier's possession. A contract specifying FOB seller's plant means the "seller was required only to place the goods in the possession of a carrier, make a reasonable contract for shipment, tender documents of title, and notify the buyer of the shipment." *Alliance Wall Corp. v. Ampat Midwest Corp.*, 17 Ohio App.3d 59, 62 (8th Dist. 1984). *See also Local Trademarks, Inc. v. Derrow Motor Sales, Inc.*, 120 Ohio App. 103, 106 (3d Dist. 1963) (FOB signifies that the buyer will be responsible for the cost of shipment).

{¶ 202} The trial court found, based on competent evidence, that invoices directed to N.E.S. under Perk's Union Avenue and U.S. 322 purchase orders reflected costs associated with fulfilling those Perk orders. Shelly presented unrebutted testimony that no separate purchase orders were prepared for delivery of materials. Rather, the purchase price on each purchase order was for fulfillment at Shelly's plant, and delivery beyond that point was at Perk's cost unless otherwise agreed. Under the Union Avenue and U.S. 322 purchase orders, therefore, Perk remained financially responsible for costs associated with delivery, an expense associated with conveying materials ordered by Perk to its public projects. The trial

court had competent, admissible evidence to support the conclusion that invoicing N.E.S. for delivery could be treated as a billing accommodation rather than a contract modification releasing Perk from responsibility for delivery costs.

{¶ 203} We recognize that to some extent the trial court relied on Trafficante's testimony that Perk requested that outstanding invoices be sent to N.E.S. The Perk Defendants lodged a hearsay objection, and the court itself questioned Trafficante, an exchange that clarified that he did not personally take that direction from Perk. (Tr. 73-74.) The trial court found this was nevertheless admissible as habit evidence under Evid.R. 406, which provides that "evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

{¶ 204} That evidentiary rule "has been applied 'to establish that the witness's routine practice was adhered to in the situation before the court as to which the witness has no particular recollection.'" *State v. Ouch*, 2008-Ohio-4894, ¶ 18 (10th Dist.), quoting *Burris v. Lerner*, 139 Ohio App.3d 664, 671 (8th Dist. 2000). "To lay the proper foundation," however, "the proponent of the evidence must show that routine in fact exists *and that the stimulus for the habitual response occurred on the particular occasion*.'" (Emphasis added.) *Burris* at 672, quoting *Brokamp v. Mercy Hosp. Anderson*, 132 Ohio App. 3d 850, 865 (1st Dist. 1999). Here, similar to his testimony regarding the alleged change to the Auburn purchase order,

Trafficante denied any personal involvement in fielding whatever communication might have served as the proffered stimulus, i.e., a request to bill N.E.S. instead of Perk. The trial court nevertheless treated Shelly's routine response as proof that the legally significant stimulus occurred.

{¶ 205} The trial court's findings related to habit, however, were not necessary to sustain its breach-of-contract findings as to Union Avenue and U.S. 322. Those projects were supported by Perk purchase orders and the corresponding FOB terms, i.e., "FOB Seller's plant sourcing the order." By contrast, Auburn depended on the challenged hearsay and unauthenticated notation to establish Perk as the contracting buyer in the first instance.

{¶ 206} We therefore overrule this assignment of error as it relates to the Union Avenue and U.S. 322 projects. The fact that Shelly sent hauling invoices to N.E.S. does not defeat Perk's contractual liability under the purchase orders, particularly where the terms associated with the purchase orders made the materials FOB Shelly's plant. Accordingly, Perk remains liable for payment of the outstanding Union Avenue and U.S. 322 invoices admitted at trial and Tony Cifani remains liable under his personal guaranty. As discussed in more detail below in connection with the Perk Defendants' fifth assignment of error, Hudson was properly found liable on the payment bonds in connection with the Union Avenue and U.S. 322 projects because Perk, as principal contractor, was in direct privity of contract with Shelly as supplier, obviating the need for notices of furnishing with respect to those two projects.

{¶ 207} Accordingly, we remand the case to the trial court to recalculate contract damages and associated guaranty damages, bond liability, interest, and fees as to the Union Avenue and U.S. 322 projects. In addition, our remand as to these assignments of error includes our previously articulated directive that the trial court consider whether an unjust-enrichment theory as to Auburn was actually tried by consent and, if so, whether judgment can be entered on that alternative theory without reopening the trial to take additional evidence.

{¶ 208} We stress that nothing in our resolution of these assignments of error, or indeed any other holding in this opinion, disturbs the trial court's judgment against nonappealing defendant N.E.S.

## B. Third Assignment of Error

{¶ 209} In their third assignment of error, the Perk Defendants contend that the trial court erred by refusing to grant judgment to them as a matter of law on Shelly's claim for unjust enrichment. We find merit to this assignment of error.

{¶ 210} We first note that, as with the second assignment of error, we reject the Perk Defendants' framing of the standard of review. This case was tried to the bench. As discussed above, we instead apply a civil manifest-weight standard, deferring to the trial court on findings of fact to the extent they are supported by some competent, credible evidence going to all of the essential elements of a claim, but reviewing pure questions of law de novo.

{¶ 211} In reaching its award on unjust enrichment against Perk and Tony Cifani, the trial court began with exhibit No. 53, identified simply as an aging

analysis — i.e., an account printout — of outstanding N.E.S. invoices. The total amount due from N.E.S., pursuant to that printout, was $1,244,769.05. The trial court then subtracted the amount paid by Bojec under a settlement agreement ($223,000.00), the amount Shelly conceded it had been paid under the formerly disputed Lake Avenue project ($20,602.00), and the amounts due under Shelly's breach-of-contract theories pertaining to the Union Avenue, U.S. 322, and Auburn projects ($357,492.49), for a bottom-line total of $643,674.56.

{¶ 212} In connection with this assignment of error, the Perk Defendants focus on the purported lack of proof supporting the unjust-enrichment claim, purported evidence of payment, the prohibition of additional equitable remedies when the parties' relationship concerning the same subject matter is governed by a contract, and the alleged prospects for a double payment and double recovery.

{¶ 213} We begin and end our analysis with the Perk Defendants' first argument, which we view as dispositive. The Ohio Supreme Court has succinctly summarized the elements of an unjust-enrichment claim:

> A successful claim of unjust enrichment requires a showing that (1) a benefit was conferred by the plaintiff on the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment.

*Bunta*, 2022-Ohio-4363, at ¶ 36. At trial, Shelly's focus was principally on the named projects that involved purchase orders that were plainly between Perk and Shelly (Lake Avenue, Union Avenue, and U.S. 322) plus the purchase order for which Shelly alleged Perk had been substituted as the contracting customer

(Auburn).  The unjust-enrichment award against Perk for $643,674.56 represented the residual N.E.S. account balance after credits pertaining to the named projects and recovery against Bojec rather than a project-by-project measure of a benefit Perk retained without paying N.E.S. or Shelly.

{¶ 214} In connection with N.E.S.'s residual account balance, however, there was no evidence presented at trial demonstrating that Perk received and retained a benefit in connection with unpaid materials, construction projects, or outstanding invoices.  All invoices submitted at trial were tied to the four referenced construction projects, not to N.E.S.'s residual debt of $643,674.56.  We agree with the Perk Defendants that Shelly failed to offer underlying purchase orders, invoices, or other documentation associated with this residual N.E.S. debt that demonstrated a connection to Perk projects or that Perk received or retained any benefit associated with this portion of N.E.S.'s debt — which, it bears repeating, was not tied to the four named projects.  The record does not trace the $643,674.56 to materials for which Perk was enriched rather than to N.E.S.'s separate debts.  Simply put, there was no competent, credible proof that Perk retained an unpaid benefit beyond its contract liabilities, which have already been addressed.

{¶ 215} On appeal, in fact, Shelly's principal argument references evidence adduced at trial that was explicitly tied to "the construction projects at issue[,]" and then points to transcript passages regarding testimony concerning the named projects, not the residual N.E.S. debt.  (Shelly's brief at p. 20-21.)  In that exchange, which occurred during the initial cross-examination of Tony Cifani, Shelly

addressed Perk's receipt and retention of materials "project by project," i.e., for Union Avenue, U.S. 322, Auburn, and Lake Avenue. (Tr. 200-203.)

{¶ 216} Nevertheless, and as we have already noted in connection with the Perk Defendants' first assignment of error, in virtually the same breath Shelly states on appeal that "[t]he four purchase orders that Perk issued to Shelly . . . are not at issue in the unjust enrichment claim." (Shelly's brief at p. 21, fn. 2.) This contradictory framing does nothing to tie N.E.S.'s residual debt to any materials furnished to and retained by Perk to Shelly's detriment.

{¶ 217} Accordingly, the Perk Defendants' third assignment of error is sustained, and the unjust-enrichment award of $643,674.56 is vacated in its entirety as to Perk. Tony Cifani's personal liability for N.E.S.'s residual debt under Shelly's veil-piercing theory, however, will be discussed below in connection with the Perk Defendants' fourth assignment of error.

{¶ 218} We emphasize that in calculating the unjust-enrichment award of $643,674.56, the trial court had already deducted the amount awarded on the Auburn purchase order, an award explicitly tied to its finding that Perk had entered into and breached a contract with Shelly regarding the Auburn project. In connection with the Perk Defendants' first and second assignments of error, we have reversed the contract judgment as to the Auburn purchase order and remanded the case to the trial court to determine in the first instance whether a claim of unjust enrichment as to Auburn was tried by express or implied consent and, if so, whether the trial court may award damages on that alternative basis or instead needs to

reopen the trial to take additional evidence. Our disposition of the Perk Defendants' third assignment of error, therefore, should not be taken as an expression of any opinion on the possible merits of any unjust-enrichment arguments pertaining to the Auburn project.

### C. Fourth Assignment of Error

{¶ 219} In their fourth assignment of error, the Perk Defendants contend that the trial court erred as a matter of law by entering judgment against Tony Cifani on Shelly's veil-piercing theory. While we do not reach the merits of the veil-piercing claim, we sustain this assignment of error on procedural grounds. Specifically, we conclude that the trial court abused its discretion by permitting Shelly to amend its pleadings to conform to the evidence where no explicit allegations of fraud, in the form of either fraudulent misrepresentation or fraudulent conveyance, had been levied against Tony Cifani in any version of Shelly's complaint. As explained below, while the record does not support a claim that the Perk Defendants were surprised that Shelly would pursue a veil-piercing theory against Tony Cifani, the record does indicate that trial testimony focused on (1) alleged misrepresentations by Tony Cifani to Chadrick Reel concerning assurances of forthcoming payment; and (2) a fraudulent-conveyance theory tied to newly obtained bank information. The record further indicates that the Perk Defendants could not reasonably anticipate these theories and were deprived of a fair opportunity to respond.

{¶ 220} No iteration of Shelly's complaint sought to hold Tony Cifani liable under a veil-piercing theory for N.E.S.'s debts. Instead, Count VI of the second

amended complaint, filed February 14, 2024, sought a declaratory judgment that N.E.S. and Perk became alter egos of each other and that Perk was therefore liable for N.E.S.'s debts. In its first trial brief, filed October 14, 2024, Shelly did state that it sought to recover against Perk and Tony Cifani under a veil-piercing theory, alleging that several "facts were discovered . . . which support the conclusion that Defendants Perk and Tony Cifani abused NES's corporate form with the intent of avoiding payment obligations to Shelly." (Shelly's Oct. 14, 2024 trial brief at p. 3.) The list of purported facts included allegations with respect to Tony Cifani's partial ownership of N.E.S., the companies' operational integration, and that Tony Cifani eventually began running N.E.S.'s day-to-day operations. No allegation of fraud, however, including fraudulent representation or fraudulent conveyance, appears in the trial brief.

{¶ 221} The same is true of Shelly's second trial brief, filed January 24, 2025. This version of Shelly's trial brief added several additional purported facts (albeit in general terms) in support of veil piercing. The allegations included contentions that Tony Cifani "caused funds to be transferred between Perk and NES[]" and "left NES unavailable for judgment." These new allegations were expressly framed as stemming from "the recent documents produced by CF Bank[.]" (Shelly's Jan. 24, 2025 trial brief at p. 3.) Again, however, there was no specific mention of a fraudulent misrepresentation or concealment, or any fraudulent conveyance, and no effort to formally amend the complaint to add such allegations.

{¶ 222} In their own January 24, 2025 second trial brief, the Perk Defendants specifically objected to the veil-piercing theory as to Tony Cifani as never properly pleaded by Shelly. Furthermore, as discussed in our summary of the trial, the Perk Defendants argued that "there is no pleading anywhere in this case where it was ever alleged fraud, or illegal acts, or anything veil piercing worthy. There is no underlying tort." (Tr. 402.) Shelly thereafter invoked Civ.R. 15(B), arguing that "you can move to conform to the evidence[]" and it believed such "issues have been impliedly tried by the parties." (Tr. 412.)

{¶ 223} Civ.R. 15(B) provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

This court has stated:

"In determining whether the parties impliedly consented to litigate an issue, courts consider various factors, including 'whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory; and whether the witnesses were subjected to extensive cross examination on the issue.'"

*In re J.Q.-P.*, 2024-Ohio-661, ¶ 29 (8th Dist.), quoting *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41 (1983), paragraph one of the syllabus.[13] "'Under Civ.R. 15(B), implied consent is not established merely because evidence bearing directly on an unpleaded issue is introduced without objection. Rather, it must appear that the parties understood the evidence was aimed at the unpleaded issue.'" *In re J.Q.-P.* at ¶ 29, quoting *Evans* at 46.

{¶ 224} "An implied amendment of the pleadings will not be permitted, however, where it results in substantial prejudice to a party." *Evans* at 46. Accordingly, "due to the requirements of procedural due process, trial of unpleaded issues by implied consent is not lightly inferred." *Meilen v. Meilen*, 2013-Ohio-4883, ¶ 24 (10th Dist.), citing *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir. 1985); *In re J.Q.-P.* at ¶ 29. *See also Deere & Co. v. Johnson*, 271 F.3d 613, 622 (5th Cir. 2001); *Morgan & Culpeper, Inc. v. Occupational Safety & Health Rev. Comm.*, 676 F.2d 1065, 1068 (5th Cir. 1982) ("While it is true that amendments . . . should be freely granted, it is just as certain that the [party] charged should be given an opportunity to fully respond to the new theories presented."). "This court held that while a plaintiff is not bound by any particular theory of recovery, a plaintiff is bound by the facts asserted in the complaint." *Bernard v. Christopherson*, 2024-Ohio-6016, ¶ 22 (8th Dist.), citing

---

[13] These will hereafter be referred to as the "*Evans* factors."

*Kavalec v. Ohio Express, Inc.*, 2016-Ohio-5925, ¶ 19 (8th Dist.), citing *Allied Erecting Dismantling Co. v. Youngstown*, 2002-Ohio-5179, ¶ 75 (7th Dist.).

{¶ 225} "We review a trial court's ruling on a Civ.R. 15(B) motion to amend pleadings for abuse of discretion." *Bernard* at ¶ 19. As discussed in connection with the Perk Defendants' first assignment of error, a trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter*, 2025-Ohio-366, at ¶ 64 (8th Dist.), citing *Johnson*, 2021-Ohio-3304, at ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore*, 5 Ohio St.3d 217. *See also McAlpin*, 2026-Ohio-148, at ¶ 14.

{¶ 226} *Bernard* involved access to a Lake Erie beach via a path historically used by residents of Corning Drive in Bratenahl, Ohio. The access path was situated between two lakefront properties, one newly owned by the Kristin Callow Voos Family Trust. Kristin and James Voos resided in the home. After moving into their new home, the Vooses noticed others using the access path to the beach and became concerned for their privacy and safety. After consulting property records, they came to believe that any right that their nonlakefront neighbors enjoyed to the access path had terminated in 1952.

{¶ 227} Thirty-one neighbors disagreed and filed suit against the Vooses and others. The first iteration of the complaint included causes of action for "statutory waste, tortious interference with property rights, injunctive relief to prevent such tortious interference, and declaratory judgment." *Bernard*, 2024-Ohio-6016, at ¶ 8

(8th Dist.). It did not, however, reference any interest in the Voos property. The amended complaint added a slander-of-title claim but likewise did not reference an interest in the Voos property. *Id.* at ¶ 9. The second amended complaint added "a separate claim for injunctive relief to remove encroachments across" the access path but again "did not assert any interest" in the Voos property. *Id.* at ¶ 10.

{¶ 228} After several claims, crossclaims, and counterclaims were disposed of via cross-motions for summary judgment, the case proceeded to a bench trial. During opening statement, counsel for the Vooses "brought the trial court's attention to 'the claims that have not been raised in this case[,]'" indicating that no version of the complaint contained "any note of prescriptive easement, adverse possession, or any claimed right to" the Voos property. *Id.* at ¶ 28. At trial, however, the evidence included expert reports and surveys indicating that there were "well-worn footpaths and stairs" outside of the access path and specifically on the Voos property. *Id.* at ¶ 13.

{¶ 229} At the conclusion of trial, plaintiffs orally moved to amend the pleadings to conform to the evidence pursuant to Civ.R. 15(B) as to claims of adverse possession or a prescriptive easement, arguing that evidence included residents' testimony as to their use of the path and that they were cross-examined "regarding their use of the path specifically directed at undercutting an adverse possession or prescriptive easement claim." *Id.* at ¶ 13. The trial court granted the motion over the Vooses' objection "that neither adverse possession nor prescriptive easement were pled in any of the complaints and the case may have been defended differently

if they knew that those would be prospective claims." *Id.* at ¶ 13. The Vooses later moved for reconsideration of that decision, arguing again "that amending the pleadings to include adverse possession and prescriptive easement substantially prejudiced the defendants because they would have defended the claims differently[]" and were therefore deprived of a fair opportunity to address the claims. *Id.* at ¶ 14.

{¶ 230} The trial court denied the motion to reconsider, finding that those claims could not have come as a surprise. In its findings of fact and conclusions of law, the trial court stated that plaintiffs, via adverse possession, had obtained an ownership interest in the historically used footpaths and the areas where the stairs are located. *Id.*, 2024-Ohio-6016, at ¶ 16 (8th Dist.).

{¶ 231} On appeal, this court agreed with the Vooses that the trial court erred by permitting the amendment to conform to the evidence. It first noted that the disputed issues were plainly not tried by express consent, given the objection at trial to the Civ.R. 15(B) motion and the subsequent motion for reconsideration. *Id.* at ¶ 23. This parallels the present action, in which the Perk Defendants specifically objected to an amendment to conform to the evidence.

{¶ 232} Turning to the *Evans* factors for implied consent, the *Bernard* Court held that the plaintiffs "did not assert factual allegations in the complaint consistent with adverse possession nor prescriptive easement" of the Voos property and that "the Vooses did not have a fair opportunity to address the theory of adverse possession as it relates to" their property at trial. *Id.* at ¶ 24. Accordingly, "the

Vooses could not have addressed or defended adverse-possession or prescriptive-easement claims against the Voos Property absent a clear understanding that Plaintiff[s] were making such claims regarding that property." *Id.*

{¶ 233} In the present case, as in *Bernard*, there were three versions of the complaint with a multitude of factual allegations and claims. At no point, however, was the complaint amended to include a veil-piercing claim against Tony Cifani, and it never contained any allegations of fraudulent misrepresentations, fraudulent concealment, or fraudulent conveyances.

{¶ 234} We acknowledge that there is substantial support for Shelly's position that the veil-piercing issue as to Tony Cifani was actually tried. In addition to references in the trial briefs, Shelly identified the veil-piercing theory in its opening statement. It presented evidence of Tony Cifani's alleged control of N.E.S., as well as the transfer of funds between N.E.S. and Perk. The Perk Defendants acknowledged the veil-piercing claim. They responded to it in opening statement and cross-examined witnesses as to the same facts. They also moved for judgment at the close of Shelly's case on all claims, including veil-piercing, and later presented Tony Cifani's explanation for the challenged money transfers pinpointed by Shelly in the recently obtained CF Bank records.

{¶ 235} It is those records, however, and their use to bootstrap unpleaded fraudulent-conveyance claims, that resulted in unfair surprise and prejudice to Tony Cifani. The same is true to the extent the trial court's more general fraud

determinations flowed from Reel's testimony that Tony Cifani made false promises of payment upon which Shelly, through Reel, relied.

{¶ 236} In *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos. Inc.*, 67 Ohio St.3d 274 (1993), and *Dombroski v. Wellpoint, Inc.*, 2008-Ohio-4827, the Ohio Supreme Court

> held that the corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) the shareholder's control over the corporate entity is so complete that the corporation has no separate mind, will, or existence of its own; (2) the shareholders exercised control over the corporation in such a manner to commit fraud, an illegal act, or a similarly unlawful act; and (3) that the plaintiff sustained injury or unjust loss as a result of the shareholder's control and wrongful conduct.

*Hayes v. Mingo Properties LLP*, 2025-Ohio-378, ¶ 23 (8th Dist.), citing *Belvedere* at paragraph three of the syllabus, and *Dombroski* at ¶ 18. "In some instances, a complaint seeking to pierce the corporate veil, which recites the elements of the *Belvedere-Dombroski* test, may be sufficient to carry the plaintiff's pleading burden for purposes of a motion to dismiss." *Hayes* at ¶ 24, citing *Kurtz Bros. Inc. v. Ace Demo, Inc.*, 2014-Ohio-5184, ¶ 28 (11th Dist.). "[T]o constitute fair notice," however, "the complaint must still allege sufficient underlying facts that relate to and support the alleged claim and may not simply state legal conclusions." *Hayes* at ¶ 24, citing *Henderson v. Ohio*, 2015-Ohio-1742, ¶ 10 (8th Dist.). "The complaint," therefore, "must contain either direct allegations on every material point necessary to sustain a recovery or contain allegations from which an inference may be fairly drawn that evidence on these material points will be introduced at trial." *Hayes* at ¶ 24, citing *Strahler v. Vessels*, 2012-Ohio-4170, ¶ 10 (4th Dist.).

{¶ 237} Before turning to the issue of fraudulent conveyances, we address the subject of fraudulent misrepresentations and concealment. Despite the absence of any version of the complaint pleading fraud with particularity, the trial court's judgment entry states at multiple junctures that Tony Cifani exercised control over N.E.S. to commit fraud against Shelly. (*See, e.g.,* judgment entry at p. 19, ¶ 122, and p. 31, ¶ 52.) The Perk Defendants cite *Fast Tract Title Servs. v. Barry*, 2022-Ohio-1943 (8th Dist.), for the proposition that "'a plaintiff who seeks to satisfy the *Belvedere-Dombroski* test by alleging fraud must meet the heightened pleading requirements imposed by Rule 9(B).'" *Fast Tract* at ¶ 18, quoting *Kurtz Bros.*, at ¶ 28, citing *S.E. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006).[14] "This means that a plaintiff must state "'the time, place, and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud."'" *Cord v. Victory Solutions, LLC*, 2018-Ohio-590, ¶ 14 (8th Dist.), quoting *Carter-Jones Lumber Co. v. Denune*, 132 Ohio App.3d 430, 433 (10th Dist. 1999), quoting *Baker v. Conlan*, 66 Ohio App.3d 454, 458 (1st Dist. 1990). "Such particularity is required to both apprise the opposing party of the act that is the subject of the fraud claim and to allow the

---

[14] The elements of fraud are (1) a representation of fact, or where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation or concealment; and (6) a resulting injury proximately caused by the reliance. *Fast Tract* at ¶ 27, fn. 3, citing *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169 (1984).

opposing party to prepare an effective defense." *Fast Tract* at ¶ 12, citing *Turner v. Salvagnini Am., Inc.*, 2008-Ohio-3596, ¶ 26 (12th Dist.).

{¶ 238} In *Fast Tract*, a jury found Barry "personally liable for fraud under a claim of piercing the corporate veil." *Id.* at ¶ 1. This court held, however, that "even a cursory review of the complaint demonstrates that the complaint did not set forth with any particularity the time, manner, and circumstances of Barry's alleged fraud[,]" and that the trial court should therefore have granted his Civ.R. 12(B)(6) motion to dismiss for failure to state a claim. *Id.* at ¶ 21.

{¶ 239} We agree with the Perk Defendants that the trial court abused its discretion by permitting an amendment to conform to the evidence and then finding various species of fraud where no fraud claim had been pleaded with particularity. This is particularly concerning when considering Shelly's decision to elicit testimony from Reel that Tony Cifani made certain representations as to forthcoming payment and that Reel relied upon those representations. While Shelly seeks to distinguish *Fast Tract* because a Civ.R. 12(B)(6) motion had been filed in that case, this puts the proverbial cart before the horse: With no allegations whatsoever of fraud in any iteration of the complaint, particularly as to any fraudulent activity by Tony Cifani, there was nothing to trigger a Civ.R. 12(B)(6) motion contending that fraud must be pleaded with particularity.

{¶ 240} Moreover, Shelly's fraud theories as to Tony Cifani clearly began to coalesce no later than August 2024, as evidenced by statements in its opposition to the Perk Defendants' cross-motion for summary judgment. In that pleading, for

example, Shelly stated that Tony Cifani and Perk operated N.E.S. "as if it had no separate mind, will, or existence of its own, exercised in such a manner as to commit fraud against Shelly." (Shelly Aug. 13, 2024 combined reply and opposition brief at p. 12.) That pleading was filed more than five months before the commencement of the bench trial. Shelly still did not seek to amend its complaint further to plead fraud with particularity.

{¶ 241} In response, Shelly correctly argues that proof of fraudulent conveyances may be sufficient to satisfy the second *Belvedere-Dombroski* element. *See, e.g., William E. Weaner & Assocs., LLC v. 369 W. First, LLC*, 2020-Ohio-48, ¶ 55 (2d Dist.) ("Disposing of assets in violation of the [Uniform Fraudulent Transfer Act] has been found to satisfy this requirement."). Moreover, complaints alleging fraudulent conveyances need not meet the stringent pleading requirements of Civ.R. 9(B). In *Flagstar Bank, FSB v. Sellers*, 2010-Ohio-3951 (12th Dist.), the Twelfth District held that "'[u]nlike common-law fraud that must be pleaded with particularity under Civ.R. 9(B), no similar requirement applies when the issue of fraudulent conveyance is raised[.]'" *Id.* at ¶ 15, quoting *Stewart v. R.A. Eberts Co.*, 2009-Ohio-4418, ¶ 26 (4th Dist.), citing *Wagner v. Galipo*, 50 Ohio St.3d 194, 197 (1990). In *Flagstar Bank*, the court upheld the trial court's summary-judgment determination that Sellers had "systematically [disposed] of [company] assets . . . to the detriment of Flagstar, its creditor, in violation of the Ohio Uniform Fraudulent Transfer Act." *Flagstar Bank* at ¶ 23. Further, in *Stewart*, the Fourth District found the complaint sufficient to state a fraudulent-conveyance claim where plaintiff

alleged, inter alia, that the individual defendants exercised their dominion and control over the company "to commit fraud and illegal acts by dissolving Eberts, Inc. and reconstituting it as Eberts, LLC *and in transferring and disposing of assets* of Eberts, Inc. and/or Waterloo and/or Eberts, LLC[.]" (Emphasis added.) *Stewart* at ¶ 23.

{¶ 242} The issue, however, is not whether a fraudulent-conveyance claim may be sufficient to satisfy the second *Belvedere-Dombroski* prong, but whether the Perk Defendants were on notice of such a claim so they could prepare a defense. Shelly's own argument that fraudulent conveyances can support the fraud, illegal act, or other otherwise unlawful act component of the *Belvedere-Dombroski* test actually proves too much. While its citation to *Weaner* is not specifically directed to that prong, Shelly cites that case for its holding that "large amounts of money were paid 'without corresponding proof of promissory notes or other evidence of obligation to 369.'" (Shelly's brief at p. 33, quoting *Weaner* at ¶ 52.) *Weaner*, however, was expressly pleaded as a fraudulent-conveyance claim, with the first cause of action alleging a violation of the Ohio Uniform Fraudulent Transfer Act, citing R.C. 1336.05, and including "language" that "closely track[ed] the elements in R.C. 1336.04(A)." *Weaner* at ¶ 76.

{¶ 243} *Weaner* demonstrates how the Perk Defendants were prejudiced by Shelly's late-evolving fraudulent-conveyance theory, a theory that was never pleaded and did not even appear in Shelly's trial briefs. The *Weaner* Court conducted an extensive analysis of the record and ultimately concluded that because

"nine badges of fraud existed, there was substantive probative evidence of an inference of fraud." *Weaner* at ¶ 69. Crucially, it then noted that "'if the party alleging fraud demonstrates "a sufficient number of badges, *the burden of proof then shifts to defendant* to prove that the transfer was not fraudulent."'" (Emphasis added.) *Id.* at ¶ 58, quoting *Individual Business Servs. v. Carmack*, 2013-Ohio-4819, ¶ 27 (2d Dist.), quoting *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App.3d 644, 650 (10th Dist. 1993).

{¶ 244} Here, the trial court found that Tony Cifani had transferred almost $300,000 from N.E.S. to Perk with the intention of rendering N.E.S. judgment proof. It further found that while Tony Cifani claimed to have transferred the money "to repay Perk for money it loaned" N.E.S. and "for accounting and legal services it obtained" on behalf of N.E.S., Tony Cifani did not provide sufficient evidence of the loans, accounting, or legal services. Specifically, the trial court found that "Cifani presented no substantiation or other documentation memorializing the alleged loan(s)[]" and that he "did not present competent, credible, admissible evidence" to support transferring money from N.E.S. to Perk as repayment for accounting or legal services. (Judgment entry at p. 16-17, ¶ 109-110; p. 34, ¶ 61-64; p. 35, ¶ 66-68; and p. 36, ¶ 73.) In short, it shifted the burden of proof to Tony Cifani to prove that the transfers were not fraudulent despite the lack of any pleading raising a fraudulent-conveyance claim or alleging facts that would support a fraudulent-conveyance claim.

{¶ 245} The prejudice inherent in this is evident from the record. At trial, Tony Cifani attempted to explain the transfers, relying in part on exhibit Z, identified as a "history report." Shelly objected that the document had not been turned over in discovery. The Perk Defendants responded that it had just been printed out after Tony Cifani's initial cross-examination because it was only then that they realized they needed something to address the alleged fraudulent transfers:

> We didn't know out of the haystack [of checks] what needles he was going to pull out. We learned during direct exam [sic, Cifani's testimony when called as if on cross-examination] and that's why you see a [report] print date of the other day. We have this printout from every single check that was ever issued from this company. This is a sophisticated company with sophisticated software. They have this. We just printed it off to say, "Hey, why did you do this?"

(Tr. 541-542.) The Perk Defendants further stated: "[W]e are not mind readers, so we couldn't know what they were going to bring up as far as which check or which checks." (Tr. 544.)

{¶ 246} Accordingly, we sustain the fourth assignment of error in part. The trial court abused its discretion when it permitted amendment of the second amended complaint under Civ.R. 15(B) to conform to the evidence and then entered judgment on Count VI by piercing N.E.S.'s corporate veil to reach Tony Cifani's individual assets. We vacate the portion of the judgment that amended the pleadings under Civ.R. 15(B), and we vacate the Count VI judgment against Tony Cifani in its entirety.

{¶ 247} Because the Count VI judgment is vacated on procedural grounds, we do not address whether the evidence presented at trial would otherwise satisfy

the *Belvedere* and *Dombroski* test. Instead, the case is remanded to the trial court for further proceedings consistent with this opinion. On remand, Shelly may seek leave to amend its complaint to assert a veil-piercing theory against Tony Cifani for N.E.S.'s obligations stemming from Shelly's judgment against N.E.S. The trial court shall determine any such motion in the first instance under the civil rules, including whether the proposed pleading satisfies any applicable heightened pleading requirement. If the trial court grants leave to amend, it shall permit reasonable discovery and dispositive-motion practice before any new adjudication of a veil-piercing theory. We express no opinion on whether leave to amend should be granted or on the merits of any properly pleaded veil-piercing theory.

## D. Fifth Assignment of Error

{¶ 248} In their fifth assignment of error, the Perk Defendants argue that the trial court erred by entering judgment against Hudson on Count V notwithstanding Shelly's failure to properly serve notices of furnishing. This assignment of error is largely resolved by our disposition of the Perk Defendants' first and second assignments of error.

{¶ 249} Shelly is correct that, pursuant to R.C. 153.56(C), notices of furnishing were not necessary for those projects where it was in direct privity of contract with Perk as the principal contractor. The Perk Defendants concede that privity existed "for only Perk's own orders under the Account Agreement." (Perk Defendants' reply at p. 14.) While the Perk Defendants contend that hauling invoices issued to N.E.S. for Union Avenue and U.S. 322 were not its responsibility,

we concluded in resolving the first and second assignments of error that based upon the purchase orders and their incorporated terms, the Perk Defendants were contractually responsible for all amounts due under the purchase orders executed by Perk for Union Avenue and U.S. 322. Perk and Shelly were in direct privity of contract as to the Union Avenue and U.S. 322 purchase orders, Shelly was not required to serve notices of furnishing on Perk for those projects, and the trial court did not err in finding Hudson liable as surety on those projects.

{¶ 250} We also found, however, that Perk did not assent to a contract with Shelly as to the Auburn purchase order, which identified N.E.S. as the customer, included N.E.S.'s customer number, and was executed by an N.E.S. representative. Accordingly, there was no privity of contract between Shelly and N.E.S. as to the Auburn purchase order, and Shelly's failure to serve a notice of furnishing on Perk, as the principal contractor, is fatal to any claim against Hudson on the Auburn project.

{¶ 251} Accordingly, the fifth assignment of error is sustained in part. The trial court's judgment against Hudson as to the Auburn project is vacated. The trial court's judgment against Hudson as to the Union Avenue and U.S. 322 projects is affirmed. The case is remanded for further proceedings consistent with this opinion, i.e., for the trial court to recalculate the damages award against Hudson.

### E. Sixth and Seventh Assignments of Error

{¶ 252} We address the Perk Defendants' sixth and seventh assignments of error together because they are largely moot or have otherwise been resolved by our disposition of the preceding assignments of error.

{¶ 253} In their sixth assignment of error, the Perk Defendants argue that the trial court erred by failing to grant its alternative motion for a new trial. We generally review a trial court's denial of a Civ.R. 59 motion for new trial for an abuse of discretion. *Jawary v. Underwood*, 2020-Ohio-5176, ¶ 9 (8th Dist.). *See also Cole v. Titus*, 2012-Ohio-2310, ¶ 14 (8th Dist.), citing *Harris v. Mt. Sinai Med. Ctr.*, 2007-Ohio-5587, ¶ 35.

{¶ 254} Here, the Perk Defendants expressly offer this assignment of error "as an alternative to the previous ones." (Perk Defendants' brief at p. 41.) The Perk Defendants insist they are entitled to a new trial if "any part of the judgment" is left "intact against any of the Perk Defendants[.]" (Perk Defendants' brief at p. 41.) We disagree, however, and conclude that our resolution of the previous assignments of error, to the extent they reverse and vacate discrete portions of the trial court's judgment and remand for further proceedings, obviates any need for a full-scale new trial and therefore renders this assignment of error moot. Moreover, the trial court's previous adverse rulings and credibility determinations do not establish bias. Instead, in the absence of any claim of bias rising to the level of a due-process violation, any request for disqualification of the trial court judge must be made through proper channels. *Pickett v. Steve's Doghouse, Inc.*, 2025-Ohio-2368, ¶ 84-

87 (8th Dist.).  *Compare Rodriguez v. Catholic Charities Corp.*, 2025-Ohio-4840, ¶ 189 (8th Dist.).

{¶ 255} In their seventh assignment of error, the Perk Defendants argue that the trial court's findings are contrary to the manifest weight of the evidence.  Once again, the Perk Defendants offer this as an alternative to their previous assignments of error.  We have already concluded that the trial court's Union Avenue and U.S. 322 contract findings are supported by competent, credible evidence, supporting judgment against Perk, Tony Cifani, and Hudson.  In addition, we have concluded, for reasons stated in the Perk Defendants' first and second assignments of error, that the trial court's finding of contractual liability for Auburn is not supported by competent, credible evidence.  We have nevertheless remanded that component of the case for the trial court to determine in the first instance whether a claim of unjust enrichment as to Auburn was tried by express or implied consent and, if so, whether the trial court may award damages on that alternative basis or instead needs to reopen the trial to take additional evidence.  The unjust-enrichment award as to the residual N.E.S. debt has been reversed.  The trial court's veil-piercing findings have been vacated on procedural grounds, and we have remanded for further proceedings.  Accordingly, the Perk Defendants' seventh assignment of error is overruled in part and sustained in part consistent with our resolution of the first through fifth assignments of error.

**F. Eighth Assignment of Error**

{¶ 256} In their eighth assignment of error, the Perk Defendants challenge the trial court's award of attorney fees, arguing that the court erred or otherwise abused its discretion by expecting them to oppose a "non-existent motion" and then awarding fees sua sponte. We find no merit to this assignment of error as it relates to the trial court's procedural handling of the fee issues. We nevertheless vacate the fee award and remand for recalculation based upon our resolution of the Perk Defendants' previous assignments of error.

{¶ 257} "We review a trial court's decision to award attorney fees for abuse of discretion." *Zele v. Ohio Bell Tel. Co.*, 2025-Ohio-1546, ¶ 34 (8th Dist.), citing *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). As discussed above, a trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter*, 2025-Ohio-366, at ¶ 64 (8th Dist.), citing *Johnson*, 2021-Ohio-3304, at ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore*, 5 Ohio St.3d 217. *See also McAlpin*, 2026-Ohio-148, at ¶ 14.

{¶ 258} The trial court's May 21, 2025 judgment entry found that Shelly was entitled to reasonable attorney fees and expenses and directed Shelly to submit evidence of fees and costs within 30 days. Shelly thereafter filed an affidavit that included over 200 pages of supporting documents, particularly invoices. The Perk Defendants did not respond, and Shelly later filed a notice describing the application

as "unopposed." The trial court awarded fees just a few days later. The Perk Defendants argue that no motion or even a document captioned "application" had ever been filed, that no civil rule required a response to the standalone affidavit, and that the trial court therefore awarded fees without notice and opportunity to challenge reasonableness.

{¶ 259} Civ.R. 7(B)(1) provides in pertinent part that "[a]n application to the court for an order shall be by motion[.]" A written motion triggers the response period governed by Civ.R. 6(C). We are cognizant of the trial court's ruling that Shelly was entitled to fees and its further directive to submit evidence of its legal fees and costs within 30 days of the May 21, 2025 entry. Shelly submitted such evidence. In light of that, we find procedural parallels with *Metron Nutraceuticals, L.L.C. v. Thomas*, 2022-Ohio-79 (8th Dist.). In that case, this court observed that "although perhaps not standard practice, Thomas does not cite and we do not find any case law or rule that expressly prohibits a party from making a request for attorney fees in a post-hearing brief." *Id.* at ¶ 33. In *Metron Nutraceuticals*, Thomas responded to a fee request by filing a motion to strike the fee affidavit rather than challenging entitlement to fees "or the reasonableness of the fees as set forth in counsel's affidavit," in which case "the trial court could have scheduled an evidentiary hearing regarding the requested fees." *Id.* at ¶ 34, citing *Meyers v. Hot Bagels*, 131 Ohio App.3d 82, 102 (1st Dist. 1999) ("The time to contest the reasonableness of fees was when the affidavit was submitted. Then, the trial court could have scheduled an evidentiary hearing on the reasonableness of the requested fees."). This court

ultimately held that "Metron properly submitted its request for attorney fees with counsel's supporting affidavit in its post-hearing brief, and the trial court did not violate Thomas's due process rights by considering Metron's post-hearing request for fees without conducting a hearing." *Id.* at ¶ 37.

{¶ 260} We do note, however, that while Shelly contends that the Perk Defendants' apparent understanding that there would be a fee hearing was an unwarranted assumption, at one point during the bench trial, the following exchange occurred:

> [SHELLY'S COUNSEL]: I would like to start as a part of Shelly's contract claims there's a legal fee component as well. I assumed — and I should have brought this up. I assumed you would want testimony on that if you make that finding as to the amount of fees.
>
> THE COURT: We can do a separate hearing on that.

(Tr. 384-385.)

{¶ 261} This exchange, however, does not excuse the Perk Defendants' failure to respond in any fashion to the fee affidavit until after the trial court had awarded fees. We find that the trial court did not abuse its discretion in awarding attorney fees. As noted above, however, the fee award must be recalculated given our disposition of the Perk Defendants' other assignments of error. We therefore vacate the fee award in its entirety. On remand, Shelly may file a new application or motion to which the Perk Defendants may respond in accordance with Civ.R. 6(B).

## G. Ninth Assignment of Error

{¶ 262} In their ninth assignment of error, the Perk Defendants contend that the trial court erred or otherwise abused its discretion by refusing to vacate the

attorney-fee award on the grounds of mistake in accordance with Civ.R. 60(B)(1) and (5). Because we have vacated the fee award and remanded the case for further proceedings, the Perk Defendants' ninth assignment of error is moot. App.R. 12(A)(1)(c).

{¶ 263} Judgment affirmed in part, reversed in part, and vacated in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellants and appellees share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

DEENA R. CALABRESE, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
TIMOTHY W. CLARY, J., CONCUR